## 36742. COFIELD v. THE STATE.

HILL, Presiding Justice.

This is a death penalty case.

Fabien K. Cofield was indicted by the DeKalb County grand jury for the malice murder and armed robbery of Howard Allen Bais. A jury found him guilty on both counts and sentenced him to life imprisonment for the armed robbery and death for the murder.

A witness for the state, Arnold Debran, testified that he found the victim lying on his back on the floor of a Majik Market store at approximately 7:15 a.m., on January 27, 1979. The victim's face was blue. Debran asked "Can I help you, sir?"; upon getting no response he returned to his car to go find help. He attracted the attention of Charles Priest, a Colonial Baking Company route salesman, who returned to the store with him. Priest called the police. Apparently neither Priest nor Debran realized that Bais had been shot. Eddie Morris entered the store only moments after Priest and Debran had returned. According to Priest, before Morris reached a position from which he could have seen the victim's body on the floor, he asked "Is he dead, is he dead?" Debran recalled Morris saying " 'Howard is dead,' or something like that," but Debran was not certain whether Morris could have seen the body before making that statement.

Priest testified that the victim, who managed the Majik Market, had let him in at 6:55 a.m. so that he could check the bread racks before the store opened at 7:00 a.m. While he was in the store, two customers entered and left. A third customer entered as Priest was leaving at approximately 7:10 a.m. Priest proceeded to another convenience store some 150 yards down the street. While standing

outside he thought he heard a gunshot which he assumed was a car backfiring. Almost immediately after he heard the shot he heard the squeal of car tires, and glimpsed an automobile running a red light. He proceeded to a nearby grocery store but it was closed and he left. At that point he was flagged down by Debran.

Another witness testified that when he entered the store at approximately 7:10 a.m., he saw Mr. Priest leaving. He purchased something from Bais and left for work.

The police described the cause of death to the DeKalb County medical examiner, Dr. Joseph Burton, as a "probable heart attack." In performing the autopsy, Dr. Burton ascertained that death was caused by a small caliber bullet which had entered through the victim's back, passed through his liver and diaphragm, and lodged in his heart. The small amount of bleeding which did occur was not discovered by the investigating officers because the victim was wearing a T-shirt, an outer shirt, and a dark blue jogging sweater or jacket.

Bais' supervisor testified that he was called at approximately 7:30 a.m. and was told Howard Bais had suffered a heart attack. He went directly to the store, arriving at 7:45 or 7:50 a.m. The safe was open but no money was missing from it. Upon checking the cash register he determined the store was short $104.00.

Shortly after midnight on February 6, 1979, a Bartow County deputy sheriff arrested the defendant in connection with an armed robbery in Bartow County.[1] Upon searching the defendant, the police discovered a .22 caliber revolver. Shortly after 1:00 a.m. a description of the weapon was placed in the statewide law enforcement teletype system. Later that day the gun was turned over to Kelly Fite of the State Crime Laboratory and Fite determined that the bullet which killed Howard Bais had been fired by this weapon.

On that same day, February 6, 1980, the defendant was turned over to the DeKalb County police. After being questioned, the defendant signed a written statement at 6:30 p.m. confessing to the murder and armed robbery of Howard Bais. In his confession, the defendant said that in the early morning hours of January 26 he broke into the house of a couple he knew and took a .22 caliber pistol; that he walked from there to the Majik Market, arriving just at daylight; that no one else was in the store; that he told the manager "Give me all your money"; that the manager opened the safe and put a handful of bills on the counter; that as he was putting the money in his pocket

---

[1] Although the crime for which the defendant was arrested is described in the Jackson v. Denno hearing, it was not disclosed to the jury.

the manager grabbed his wrist; that he pushed the manager away and as the manager spun around, he shot him; that he grabbed the rest of the money on the counter; that after he walked across the street he saw a car pull up to the store; that he walked away; that when he counted the money it was only $8 or $9.[2]

1. In defendant's first enumeration of error he complains of the trial court's having held a member of the traverse jury in contempt of court and sentenced him to jail on the first day of trial. He argues that the trial court's action so chilled the proceedings that reversal is mandated.

The episode at issue, which occurred after voir dire had consumed several hours, follows:

"The Court: 'Gentlemen, we seem to have another problem with another juror. Bring in the juror. What is your problem?'

"The juror: 'I've been sitting around all day and I'm stir crazy. It looks like it might be another couple of hours.'

"The Court: 'I'm sure every juror out there is tired.'

"The juror: 'I'm not used to the proceedings being slow and all that. I don't know. I'm ready to go home.'

"The Court: 'Well, you're not going home at this time. What you're going to do is go to jail. I am holding you in contempt of court for your attitude. You have been summoned here to do a job, and you simply cannot do it. You are totally disrespectful to the Court. I will sentence you to five days in jail and excuse you of further jury service.'

"(Whereupon, the juror retired from the courtroom.)

"The Court: 'Obviously that juror cannot serve. He will be excused for cause.' "

It appears from the record that only five or six potential jurors were in the courtroom at the time this incident occurred.[3] Of these, only one sat on the trial jury.

After the stricken juror was removed from the courtroom, two more members of the panel underwent individual voir dire. This consumes some 18 pages in the transcript. At that point, it being 5:30 p.m., the proceedings were recessed until 9:00 a.m. the next day. At approximately 3 p.m. the next day, the defendant objected to this

[2] The victims of the burglary did not identify the gun; they did not testify. At trial the defendant testified he purchased the .22 in Atlanta's Central City Park after the date of the murder.

[3] The panel of 42 had been asked several questions en masse and then sent to another courtroom; they were then brought back for individual voir dire, after which they remained in the trial courtroom. Five members of the panel had been questioned and seated when the above incident occurred. It is unclear whether the sixth had already been brought in for individual voir dire.

juror having been stricken for cause. At this point it would not have been appropriate to resummon and reinstate the stricken juror (who was either in jail or had otherwise been separated from the other jurors) and it would have been necessary to declare a mistrial. Yet the defendant did not move for a mistrial, possibly because the 22 jurors who had tentatively been accepted at that time were satisfactory to the defendant. Although we do not approve the court's action, especially since it was taken with at least 5 members of the jury panel present, we do not find it affected or chilled the proceedings so as to require reversal, especially in the absence of a timely objection or motion for mistrial. See *Daniels v. State,* 230 Ga. 126 (2) (195 SE2d 900) (1973); *Driggers v. State,* 244 Ga. 160 (2) (259 SE2d 133) (1979); see also Boulware v. Texas, 542 SW2d 677 (Crim. App. 1976), cert. den. 430 U. S. 959 (1977); but see People v. Lanphear, 608 P2d 689 (Cal. 1980), vacd. 49 USLW 3244 (Oct. 7, 1980).

2. Defendant's second and third enumerations of error are that the trial court erred in excusing a potential juror, Mr. Angel, on Witherspoon grounds, and in not allowing defense counsel to examine Mr. Angel as to his views on capital punishment. Under Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), jurors may be excused for cause because of conscientious objection to the death penalty only if they make it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" Id. at 522, n. 21.

Mr. Angel was stricken for cause after the following series of questions. The prosecutor asked the jurors seated in a certain row: "Are you conscientiously opposed to the death penalty?" Mr. Angel responded affirmatively. The prosecutor then asked: "Would you allow your conscientious opposition to the death penalty to influence your decision in a case where the State is seeking the death penalty? By that I mean your decision as to guilt or innocence?" Mr. Angel responded "No." The prosecutor then asked: "If the jury found the defendant guilty or a defendant in any case guilty and also was required under the statute to consider the death penalty on the penalty phase, could you ever, sir, be a member of a jury that voted to impose the death penalty?" Mr. Angel responded: "No."[4] The defendant's counsel then asked: "Mr. Angel, how long have you had these opinions that you have expressed?" Mr. Angel responded: "I

---

[4] The Prosecuting Attorney's Council of Georgia recommends (Trial Manual-Trial Procedure, 2d ed., pp. N-2, N-3) that following an affirmative answer

don't know. I've never been presented with it before. For a long time, I think, a number of years." Defense counsel: "And what is the basis for that opposition?" The prosecutor interjected: "Your Honor, I think as long as he is speaking from his conscience —" The Court: "I don't think he's required under the law to explain how he arrives at that conclusion." Defendant's counsel: "Mr. Angel, you understand that as a juror you are under a duty to follow the law as expressed by the Judge?" Mr. Angel: "Correct." Defendant's counsel: "And if we are in a death penalty situation, the Judge would instruct you that you are under a duty to consider the death penalty. Do you understand that?" Mr. Angel: "Okay." Defendant's counsel: "Not to vote for it but to consider the death penalty. Do you understand that?" Mr. Angel: "All right." Defendant's counsel [Mr. Altman]: "Now, if you are on a jury and the Judge instructed you that you must consider imposition of the death penalty, could you in good faith —" The Court: "Excuse me, Mr. Altman. Your line of examination in the Court's judgment is improper because we are eliminating that hypothetical question from existing by affording the juror to exercise his conscientious objection to the imposition of the death penalty under any circumstances, which he has a clear right to do so, and to propose theoretical situations to him which he is not going to be confronted with is a waste of time." Defendant's counsel: "I was simply asking Mr. Angel —" The Court: "I understand what you were simply asking him. I direct you not to do it because it is improper." Defendant had no further questions. The trial court granted the state's motion to strike Mr. Angel for cause, to which the defendant objected.

On appeal, the defendant relies on Boulden v. Holman, 394 U. S. 478 (89 SC 1138, 22 LE2d 433) (1969), arguing that the Supreme Court held there that a juror could not be excluded on the basis of an affirmative answer to the question: "You think you would never be willing to inflict the death penalty in any type case?" Id. at 482, n. 6. We disagree with the defendant's reading of Boulden. In our view, the U. S. Supreme Court did not disapprove the exclusion of the two

---

to the statutory question [Code § 59-806 (4)] "Are you conscientiously opposed to capital punishment?" the following questions be asked: (1) "Are you so irrevocably opposed that you would vote against the death penalty regardless of the facts and circumstances that might emerge in the course of the proceedings?" (2) "Do you mean that you are so opposed to the death penalty that you would vote against it no matter what the evidence at trial showed?" The juror would be disqualified if these questions were answered unequivocally in the affirmative. Equivocal or conditional answers are not sufficient to disqualify the juror.

jurors discussed in note 6 but remanded because of the exclusion of 13 other jurors who merely stated that they had "a fixed opinion against" capital punishment or that they did not "believe in" capital punishment. Id. at 482-483.

We conclude that Mr. Angel was subject to being stricken for cause on the basis of his answers to the questions put to him by the prosecutor. Boulden v. Holman, 394 U. S. at 482, n. 6. Here the defendant undertook to rehabilitate the juror by ascertaining whether he would follow the instructions of the trial judge and "consider" sentencing the defendant to death, yet not vote for the death penalty. It is not sufficient that the juror be willing to "consider" the death penalty if he or she is committed to automatically vote against the death penalty after having "considered" it. As was indicated in Boulden, supra, the juror must be able to abide by existing law, ". . . to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case." 394 U. S. at 484. The trial judge did not err in refusing to allow defense counsel to examine the juror as was undertaken in this case. See also People v. Nye, 78 Cal. Rptr. 467 (455 P2d 395, 399) (1969), cert. den. 406 U. S. 972 (1972); North Carolina v. Smith, 291 N. C. 505, 526-527 (231 SE2d 663) (1977); Bodde v. Texas, 568 SW2d 344, 350 (Crim. App. 1978), cert. den. 440 U. S. 968 (1979).

3. Defendant next enumerates as error the trial court's ruling that a defense witness, Eddie Morris (the man who entered the store while Debran and Priest were there and said "Is he dead" or words to that effect), was incompetent and the trial court's refusal to compel the witness's appearance at trial. At the conclusion of the Jackson-Denno hearing, the trial judge asked: "Is there anything else we should take up now?" The defendant responded that Eddie Morris was in a private nursing home and that it appeared that the administrator of the home would not release Morris on the authority of a subpoena to allow him to testify for the defendant and that a court order was necessary. The defense attorney had apparently already brought this matter to the trial court's attention, because the trial judge had already spoken to the administrator. Following the defendant's request that the court issue an appropriate order he stated:

"The Court: 'Mr. Provost is apparently the administrator of the institution, a privately owned institution as I understand it. He is there under voluntary commitment through his mother. It appears to me from information I have received that this man had been an inmate of Milledgeville State Hospital for practically the last 30 years, all of his adult life, and he had been on furlough for a short

period of time with his mother and that he [she?] had made a determination that he [she?] was unable to care for him and has surrendered him to this institution where he caused problems and they are now seeking to send him back to Milledgeville where he wished to go as he considered it home. I thought this ought to be in the record.' "

A colloquy followed in which the court made clear that there were two hurdles which defendant had to overcome before Mr. Morris could testify: first, defendant had to show he had been properly subpoenaed, and second, the relevancy of Morris's testimony had to be established. Defense counsel stated that his investigator had left a subpoena for Morris at his home, and that he had also served a subpoena on Morris at the nursing home.[5] The court pointed out that defense counsel's statements as to service of the subpoenas by his investigator were hearsay, and defense counsel responded that he would bring in the investigator to make a proper showing. The hearing concluded with the trial court's statement: "All right. I will give him a writ of attachment if in fact there is a proper showing. Be back in here at quarter of nine in the morning." No further proceedings in relation to this matter appear in the transcript until the following statement by the trial judge, made to the jury when the trial recommenced following a recess at 11:00 a.m. that next day: "Ladies and gentlemen, before we go further there is a brief matter which I think it would be fair to you that the Court advise you in connection with. That is the fact that the witness or person that we have heard referred to as Eddie Morris, I believe, has not appeared as a witness and will not is my understanding appear as a witness. The reason for that is he is in a private sanitarium at the present time, and he is not from the evidence that's available to the Court competent to testify. Both the defense and the State have made efforts to bring him here for you, but that is just a brief explanation to you as to why he is not here."

During the punishment phase of the trial the defendant again asked the court to order Eddie Morris's appearance at the trial. The court responded that the defendant had not proved that a subpoena was personally served upon Morris. Defendant's counsel stated that the investigator had personally served Morris, in Provost's presence. The trial judge pointed out that that was hearsay and then stated: "Now, we are all aware of — and the record is clear about — Mr.

---

[5] Defense counsel stated at one point that it was possible that the investigator "might testify that he personally delivered it to the administrator and not to Mr. Eddie Morris at the nursing home."

Morris's situation, and I certainly indicated to you fully in the processes of this Court we would get any witness for you that should be produced. But I was not willing — and I am not willing now — to issue an order for the sheriff to go out there and get this man from some institution where this man is confined because of his mental condition and force him to bring him into court knowing that when he gets here that he is going to be incompetent to testify without the strongest reasons being presented to the Court why it should be done, sir. Now, I will not issue such an order for you."

On appeal, the defendant argues that the trial court erred in making an ex parte determination on the basis of hearsay that Morris was incompetent to testify. The state contends that the defendant cannot raise this issue because he never proved service of the subpoena. Code Ann. § 38-801 (c). As we view the record, the defendant's offer to prove service of the subpoena was foreclosed and its necessity mooted by the trial court's ruling, communicated to the jury, that Morris was incompetent to testify. This conclusion is buttressed by the transcript of the hearing on the motion for new trial. At that hearing, the trial judge stated that he was under the impression the defendant had withdrawn his request that compulsory process issue to Morris. Defendant's counsel stated that he had not withdrawn the motion and that he would stand on the record. The record discloses no withdrawal. In that connection, the trial court stated: "I suppose at least for the purposes of this matter, we can accept the proposition that the Court accepted that a subpoena was in the hands of the proper person or the individual, whether or not it may have constituted proper service from the standpoint of the man being mentally responsible to respond to it is something outside of my knowledge, except as was developed in conjunction with all of us about the desirability and practicality of bringing him here." The transcript of the hearing on the motion for new trial also contains this colloquy: "The Court: 'All you're trying to do at this point is get something in the record to show he was under subpoena?'

"[Defense counsel]: 'That's all.'

"The Court: 'Well I guess the record reflects that.' " The state's attorney continued to maintain service had not been proven. The trial judge stated that his recollection was that he was prepared to have Morris brought to testify if requested, and concluded, "So, from the standpoint of him being served with a subpoena or not served with a subpoena is really secondary." Thus the record supports defendant's contention that he stood ready to show compliance with Code Ann. § 38-801 (c), and that this issue (whether Morris was properly served) was rendered moot by the trial court's ruling that

Morris was incompetent to testify.

The testimony of Eddie Morris could well have been critical in this case. Morris was a prime suspect until Cofield was arrested; according to police testimony, Morris admitted having discovered the body before Priest and Debran did and having stolen a T-shirt and cigarettes while Bais lay on the floor. The record indicates that he had a history of somewhat violent behavior, and also that he may have testified that he had seen a man other than the defendant leave the store. The defendant was entitled to have compulsory process issue to secure his attendance at trial under both the federal and state constitutions and under state law. U. S. Const. Am. 6, 14; Washington v. Texas, 388 U. S. 14 (87 SC 1920, 18 LE2d 1019) (1967); Ga. Const. of 1976, Art. I, Sec. I, Par. XI (Code Ann. § 2-111); Code Ann. §§ 38-801, 38-802; *Roberts v. State,* 72 Ga. 673 (1884). Therefore, we agree with the defendant that the trial court erred in making a determination that Morris was incompetent based on ex parte statements made by the administrator of the institution where Morris was confined. Under Georgia law, "The competency of a witness shall be decided by the court," Code Ann. § 38-1601, and "The court shall, by examination, decide upon the capacity of one alleged to be incompetent from idiocy, lunacy, or insanity, or drunkenness, or infancy." Code Ann. § 38-1610. The law clearly provides that the court's determination shall be made "by examination." Although there may be situations where the trial judge would not have to examine the potential witness, e.g., where a doctor might testify *under oath* and subject to cross examination that the witness was totally irrational, this was not such a case. Since the error here is not harmless beyond a reasonable doubt, we remand the case to the trial court with direction to conduct a hearing on the competency of Eddie Morris at the time of the trial. If the court determines that he was competent, defendant's right to compulsory process was abridged and a new trial must be ordered.

4. The defendant contends that his confession should have been suppressed because it was not voluntary and because it was the result of an illegal arrest.

Regarding the defendant's contention that the trial court erred in not supressing his confession as involuntary, the record reveals the following: Bartow County and Adairsville police officers testified that following an armed robbery, a radio lookout described a vehicle fitting the vehicle being driven by the defendant. After a chase the defendant was arrested at approximately 12:45 a.m. on February 6, 1979, in connection with the armed robbery of a service station in Cartersville. He was not interrogated en route to the police station, where he arrived at 12:45 a.m. An Adairsville police officer testified

he read him his rights and obtained a signed waiver at 1:30 a.m. He testified that he bought the defendant a cola, and that the defendant verbally acknowledged that he had committed the armed robbery in Cartersville, before being put in a cell to sleep at 1:45 a.m. At 7 a.m., the police took defendant from the cell and went over his rights again. At approximately 8:00 a.m., he gave a written statement admitting the armed robbery in Cartersville. He was then returned to a cell and remained there until the DeKalb County officers arrived in the afternoon. The interrogating officer testified that the defendant never asked to call an attorney. He also testified that the defendant would have been offered two meals while in custody in Bartow County.[6]

Two DeKalb officers, Rowell and Walker, left DeKalb County at 1:30 p.m. on February 6 and arrived in Bartow County at approximately 2:30 p.m. After advising him of his rights, one of the officers, Investigator Walker, questioned the defendant, who was a resident of DeKalb County, about other open robbery cases. The defendant did not ask to call an attorney. Between 3:00 and 3:30 p.m., the officers received a telephone call informing them that the ballistics test showed that the gun taken from the defendant was the one used to kill Howard Bais. Investigator Rowell, who was handling the murder investigation, called his office and requested that an arrest warrant be procured. After he obtained the number of the warrant, the two officers and the defendant left Bartow County at approximately 4 p.m., during a heavy snowfall, and arrived in DeKalb County at approximately a quarter to 5 or 5 p.m. At that time Investigator Rowell again advised the defendant of his constitutional rights and obtained a signed waiver. When Rowell told the defendant that he was on the homicide squad and was there to talk with him about a murder during the commission of an armed robbery of a Majik Market, the defendant became very emotional and confessed within 30 minutes. He signed a confession, witnessed by Investigator Walker, at 6:30 p.m. According to Rowell, no one was in the interrogation room with the defendant except himself and Walker, who came in at the end to witness the confession.

The defendant's version of the afternoon substantially tracks Rowell's, with one significant exception. According to the defendant,

---

[6] The defendant testified that he had been questioned overnight in Bartow County about armed robberies, that he had not been provided with food or drink, and that he had asked several times to be allowed to contact an attorney whose card he had but the Bartow County police had never allowed him to call the attorney and had finally taken the card from him. He stated that he was tired, hungry, and in pain when he arrived in DeKalb County, and that he did not recall signing any waiver there.

at one point Rowell left the room and a Detective Edenfield entered, knocked him from his chair and kicked him in the stomach and in the leg, causing excruciating pain. The defendant had had surgery on that leg and has a pin in it. According to the defendant, because of this treatment he confessed after Edenfield left and Rowell returned. (Although the defendant called Detective Edenfield as a witness during the Jackson-Denno hearing, he did not question him about his alleged attack on the defendant but rather limited direct examination to questions about the procuring of the arrest warrant. However, the burden of proof as to the voluntariness of a confession is upon the state.)

When the state moved for admission of the confession against the defendant's contention that the waiver was not knowing and intelligent and the confession was coerced, the trial court ruled: "The evidence clearly shows that a prima facie case has been made by the State of the admissibility, both intelligently having waived his constitutional rights and further on the basis that he voluntarily gave it under the testimony you have of the case of further slight circumstances exist that if believed would give rise to any contention there was any duress exerted upon him to get him to give the statement. On his own statement, the person that was supposed to have inflicted that duress had already absented himself from the scene before the statement was executed and detailed verbally to another officer. He is obviously a grown man. He's 21 years of age. He is a sensible individual. I don't know his height, about six three, six four I would guess, and maybe weighs 170 pounds. There has been no demonstration of any physical abuse of him that might have been discernible at the time of this alleged abuse, but at any rate all those matters will be ultimately for the jury to pass upon. But prima facially, the showing has been made of its admissibility. So on that basis it is admitted for the jury's consideration."

Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal. *Gates v. State,* 244 Ga. 587, 590-591 (261 SE2d 349) (1979); *Dampier v. State,* 245 Ga. 427, 430 (265 SE2d 565) (1980).

Except for the failure of Detective Edenfield to testify, there was sufficient evidence to support a ruling that the confession was admissible as against the claim that it was involuntary. Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1972); Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964); *Pierce v. State,* 235 Ga. 237 (3) (219 SE2d 158) (1975). However, the trial court's ruling in this case as set forth in the transcript and quoted above does not comport with Jackson v. Denno, supra, and Sims v.

Georgia, 385 U. S. 538 (87 SC 639, 17 LE2d 593) (1967). In Jackson v. Denno, the Court held that a defendant is entitled to a fair hearing and a reliable determination on the issue of voluntariness (378 U. S. at 377). In Sims v. Georgia, supra, the Court reversed, saying (385 U. S. at 541): "There is no actual ruling or finding in the record showing that the trial judge determined the voluntariness of the confession. Although he admitted it into evidence, it appears that he was only following a long-standing state practice that the 'State having made out a prima facie case that the alleged confession was freely and voluntarily made, it was a question for the jury to determine on conflicting evidence whether the alleged confession was freely and voluntarily made.' " Later, the Court said (385 U. S. at 544): "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." As in Sims, here there has been no ruling on the issue of voluntariness made with the required "unmistakable clarity."[7] On remand, in addition to the hearing as to witness Morris (Division 3 above), the trial court is directed to conduct a further Jackson-Denno hearing and make a determination of voluntariness. If the confession is not found by the trial court to have been voluntary, a new trial must be ordered. Jackson v. Denno, 378 U. S. at 393-396.

5. Defendant also contends that his confession should have been suppressed because his arrest was illegal in that the affidavit on which the murder warrant was issued stated no facts to support the detective's bare allegation that the defendant committed the crime. The Fourth Amendment (Code Ann. § 1-804) provides that ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation. . ." The decisions require that "before a warrant for either arrest or search can issue . . . the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." Whiteley v. Warden, 401 U. S. 560, 564 (91 SC 1031, 28 LE2d 306) (1971). Our Code sections and the forms prescribed therein, Code §§ 27-103, 27-103.1 and 27-104, do not contain this requirement, and to that extent they are deficient. The better practice clearly would be for the affidavit to show probable cause. However, the Fourth Amendment does not by its terms require that probable cause be

---

[7] As here, Sims involved a confession given to one officer after others allegedly had beaten him and the failure of those officers to testify. There one witness testified that he did not abuse the defendant but was unable to say that the defendant was not abused by others because he was not in the office at all times (385 U. S. at 540-541).

shown by the affidavit, but that "the judicial officer . . . be supplied" with sufficient information to support his independent judgment that probable cause exists for the warrant. Whiteley v. Warden, supra, 401 U. S. at 564. Thus we must turn to the testimony of the officer who obtained the warrant as to what additional information showing probable cause he disclosed to the officer issuing the warrant. United States v. Hill, 500 F2d 315, 320-321 (5th Cir. 1974), cert. den. 420 U. S. 931 (1975); see Aguilar v. Texas, 378 U. S. 108, 109, n. 1 (84 SC 1509, 12 LE2d 723) (1964); Johnson v. State, 111 Ga. App. 298, 302-303 (141 SE2d 574) (1965).

During the Jackson-Denno hearing, the defendant called the officer who obtained the warrant, Detective Edenfield, and asked: "And what information did you present, or what documents did you present to Judge Mobley [the Magistrate]?" The officer answered, "I swore before Judge Mobley that we had a weapon that had been positively linked to a homicide in DeKalb County at the Majik Market, the murder at Johnson Ferry and Ashford-Dunwoody Road." The defendant then referred to a transcript of a preliminary hearing and attempted to impeach the officer by asking: "And do you recall being asked the question: 'Did you tell the judge anything about the ballistics test?' You answered, 'I don't recall at this time.'" The officer responded: "I recall now." We find that in view of the officer's testimony the trial court did not err in refusing to suppress the confession on the ground that the murder warrant was invalid. United States v. Hill, supra.

Alternatively, we are not persuaded that the DeKalb County murder warrant was necessary. No challenge to the legality of the defendant's arrest and detention in Bartow County has ever been made; in fact defendant's counsel conceded at trial that the defendant was under "lawful arrest" in Bartow County. As long as the defendant was subject to legal detention in Bartow County, he cannot complain that he was transported to DeKalb County for questioning, even absent a warrant, any more than he could complain of the fact that the DeKalb County officers interrogated him in Bartow County.[8]

6. Defendant asserts that the trial court erred by restricting his right to cross examine witnesses as guaranteed by the Sixth amendment and Code Ann. § 38-1705. His specific complaint is that the trial court refused to let him ask the victim's supervisor if the victim was homosexual. Upon the state's objection, the trial court excluded the question for the time being as irrelevant. We agree with

---

[8] We note that Bartow County lies near DeKalb County and that the defendant resided in DeKalb County.

the state that the question was irrelevant; the defendant wanted to try to prove that the victim was killed in a lover's quarrel because that had allegedly once been one of the state's theories in investigating one of the witnesses who had been in the store that morning, but no evidence in support of this theory had been introduced. *Waller v. State,* 213 Ga. 291 (5) (99 SE2d 113) (1957); *English v. State,* 234 Ga. 602 (4) (216 SE2d 851) (1975). The trial court did not totally forbid this line of questioning but overruled it until such time as its relevancy was established. Furthermore, the defendant had earlier cross examined the witness at issue and ascertained that the police had asked him if he were homosexual and he had answered that he was not, and that in response to questioning he had also told the police that he had never seen the victim except in the store. Later in the trial the defendant cross examined Officer Rowell as to this matter, asking whether he had asked the state's witness at issue if he was homosexual. Officer Rowell stated that he had, and that the witness answered in the negative. Upon further questioning Rowell disavowed having ever theorized that that witness had murdered the victim in a lover's quarrel. Thus the defendant failed in his efforts to lay a foundation for this defense theory and the trial court did not err in sustaining the state's objection to the defendant's question to the victim's supervisor.

7. The remaining enumerations of error are all addressed to the penalty phase of the trial. Defendant's first complaint is that the trial court erred in excluding his mother's testimony, which was offered in mitigation. The relevant excerpt from the transcript follows:

Defense Counsel: "Q: 'Would you please state your name for the jury, please?'

"A: 'Louise Austin.'

"Q: 'And, Mrs. Austin, are you related to Fabien Cofield?'

"A: 'Yes, I am.'

"Q: 'How are you related to him?'

"A: 'I am his mother.'

"Q: 'How long have you known him?'

"A: 'All his life.'

"Q: 'Do you love him?'

"A: 'Very much.'

"Q: 'Do you want him to die, Mrs. Austin?'

"A: 'No, I do not.'

"Mr. Altman: 'Thank you very much. I have no further questions.'

"Mr. Peters: 'I have no questions. Thank you, ma'am. Your Honor, I didn't want to prolong anything for Mrs. Austin, but that's not proper 'mitigating evidence.'

"The Court: 'Of course it isn't, and counsel is well aware of that.'"

Defendant argues that his mother's testimony was relevant to mitigation, citing Lockett v. Ohio, 438 U. S. 586, 604 (98 SC 2954, 57 LE2d 973) (1978), where the United States Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencers, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The state, however, counters that the defendant's mother's testimony did not, in fact, relate to his character or record or to the circumstances of the offense and it is not, therefore, contemplated by Lockett, supra. Defendant argues that it is relevant because it shows there are people in the community who love him and that would aid in his rehabilitation were he ever paroled from a life sentence. We hold that regardless of whether the defendant's mother's testimony must be admitted under Lockett, supra, it is admissible in Georgia, and the trial court's comment was improper. We have previously held that "The trial court should exercise a broad discretion in allowing *any* evidence reasonably tending toward mitigation." *Brooks v. State,* 244 Ga. 574, 584 (261 SE2d 379) (1979). We are unwilling to foreclose a defendant seeking to avoid the imposition of the death penalty from appealing to the mercy of the jury by having his parents testify briefly to their love for him. The state frequently uses members of the victim's family for no different purpose. See *Willis v. State,* 243 Ga. 185 (15) (253 SE2d 70) (1979). However, the defendant's mother's testimony was heard in full by the jury, the jury was not instructed to disregard her testimony, and the only real issue is whether the court's statement in response to the state's objection could have caused the jury not to consider the mother's testimony in determining punishment. In closing argument in the punishment phase defense counsel referred directly to the defendant's mother and her testimony, and the trial judge charged the jury as to mitigating circumstances and as to the jury's right not to impose the death penalty even though they found aggravating circumstances to exist. See *Hawes v. State,* 240 Ga. 327 (9) (240 SE2d 833) (1977); *Fleming v. State,* 240 Ga. 142 (7) (240 SE2d 37) (1977). Under these circumstances we cannot believe the jury understood from the judge's statement that they were to disregard the mother's love for the defendant or her desire that he not die, and find the judge's statement to be harmless beyond a reasonable doubt.

8. The defendant argues that the trial court erred in not granting his motion for mistrial during the sentencing phase of the

trial. Although the trial transcript does not reflect the motion, during the hearing on defendant's motion for new trial the defendant's attorney, the state's attorney, and the trial judge agreed that the motion was made in chambers. The parties agreed to let the record reflect that the jury had deliberated all Friday, September 7, on guilt or innocence before returning a verdict of guilty. The jury then deliberated most of Saturday on the penalty. In the late afternoon, at about 4:50 p.m., the defendant asked the court to declare a mistrial as to the sentencing phase and impose a sentence of life imprisonment. The judge called the jurors in, and when they indicated they were making progress he allowed them to continue to deliberate. After recessing for dinner at 6:15 p.m., the jury resumed deliberations and later that evening returned their recommendation that the death sentence be imposed on the defendant. It has long been the rule that a motion for mistrial based on the length of the jury's deliberation is within the sound discretion of the trial court. *Driver v. State,* 112 Ga. 229 (2) (37 SE 400) (1900); *Cato v. State,* 183 Ga. 277 (2) (188 SE 337) (1936); see *Todd v. State,* 243 Ga. 539 (3) (255 SE2d 5) (1979). We find no abuse of that discretion in this case.

9. The defendant also argues that the trial court's charge in the sentencing phase was deficient because he failed to charge the elements of armed robbery, which was the statutory aggravating circumstance relied upon by the state and found by the jury. In view of the fact that the jury had been fully charged on armed robbery during the guilt phase of the trial and had found the defendant guilty of that offense, we find no error. Compare *Burger v. State,* 245 Ga. 458, 461 (265 SE2d 296) (1980).

10. Defendant's final enumeration of error is that the trial court erred in allowing the jury to correct its verdict as to penalty. The record shows that the jury first returned the following verdict: "We, the jury, recommend that the defendant Fabien Cofield, having been found guilty of malice murder, be sentenced to death." The state's attorney immediately noted that the verdict did not recite an aggravating circumstance. The trial court then informed the jury that the verdict was improper in form in that it recommended the sentence of death but did not recite an aggravating circumstance. The trial court instructed the jury to return to the jury room and correct the verdict, either by adding that they found the aggravating circumstance alleged by the state, armed robbery, or by not adding that finding and recommending life imprisonment.[9] Defendant's

---

[9] The instructions given to the jury by the trial court at this juncture follow: "Ladies and gentlemen of the jury, before the Court could receive the verdict in this

objection to this procedure was overruled. The jury then returned the following verdict: "We, the jury, recommend that the defendant, Fabien Karl Cofield, having been found guilty of malice murder while engaged in the commission of armed robbery be sentenced to death." The jury was then polled as to this verdict. We find no error in this procedure or in the court's instructions to the jury.

We have dealt with the defendant's enumerations of error and have found that the case should be remanded for two further findings (Divisions 3 and 4). Under these circumstances we will not at this time review the death sentence pursuant to Code Ann. § 27-2537 (c) but will reserve that review until the case comes before us again, if at all, pursuant to Code Ann. § 27-2537 (a).

*Remanded for further proceedings. All the Justices concur, except Jordan, C. J. and Marshall, J., who concur in the judgment only. Gregory, J., not participating.*

DECIDED FEBRUARY 10, 1981.

*Ransom & Axam, Tony L. Axam,* for appellant.
*Randall Peek, District Attorney, Jonathan C. Peters, Assistant District Attorney, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Assistant Attorney General,* for appellee.

---

form — maybe the court did not make it clear in its charge, but before you would be authorized under the law to make a recommendation of death, it would be necessary that you find the aggravating circumstance which the Court gave you in charge as contended by the State, that being that the offense of malice murder was committed during the commission of another capital felony, which was armed robbery. It would be necessary that you make a finding of that aggravating circumstance and reduce it to writing. If that is your finding, the Court would direct you to return to your room and correct your verdict accordingly. If that is not your finding, then of course the Court directs you not to make a recommendation of death but to make a recommendation of life. All right. The Court directs you then to, with those additional instructions, return and make a further return. I am assuming that you still have with you the slip of paper that I sent out with you."

We note that the court had previously charged the jury that it not recommend the death penalty unless it found the aggravating circumstance of armed robbery beyond a reasonable doubt, and had previously charged the jury that it could impose a life sentence even after finding the existence of an aggravating circumstance. See *Fleming v. State,* supra.