**Thadgus HOPKINS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 88–1475.**

District of Columbia Court of Appeals.

Argued Feb. 25, 1991.

Decided Aug. 21, 1991.

---

Joanne M. Vasco, appointed by this court, for appellant.

John F. Cox III, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas Gruscinski, Asst. U.S. Attys., were on the brief, for appellee.

Before STEADMAN, SCHWELB and WAGNER, Associate Judges.

STEADMAN, Associate Judge:

Appellant and his co-defendant at trial were arrested and charged with one count of distribution of cocaine to an undercover police officer, in violation of D.C.Code § 33–541(a)(1) (1989). Appellant was convicted and sentenced under the Youth Rehabilitation Act, D.C.Code § 24–803(a) (1989), to three years probation with a condition of 150 hours of community service. Appellant contends that he was denied a fair trial because the trial court in mid-trial summarily held three jurors in contempt. Finding that appellant was not prejudiced by this action, we affirm.

The facts relevant to this appeal are as follows. Midmorning of the second day of trial,[1] a request was made to the trial judge to allow the jury to go to the cafeteria for coffee. The courtroom clerk instructed the jury that it could have five minutes but to return directly to the courtroom. Three jurors returned after twenty minutes, thus being fifteen minutes late. The trial judge,

---

1. The trial began on Thursday, September 1 and continued, broken by the Labor Day weekend, through Wednesday, September 7. The jury brought in the guilty verdict late that day after close to three hours deliberation.

outside the presence of the other jurors, summarily found them guilty of contempt and fined each of them $25. Defense counsel did not object to this action or seek a mistrial.[2]

Appellant now contends that his Sixth Amendment right to trial by an impartial jury was violated. He invokes cases which require that a defendant receive "the continued, objective and disinterested judgment of the juror[s]," *Nelson v. United States*, 378 A.2d 657, 660 (D.C.1977) (juror, upset by deliberations, absented herself for 1½ hours but returned; no ground for reversal absent showing of prejudice), and that a court must not act to "coerce[] [jurors] into surrendering views conscientiously held." *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965) (per curiam) (trial court stated to hung jury, "you have got to reach a decision in this case").

In the absence of objection at trial, we review for plain error. *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc). Although the trial court's action gives some pause, we find no such error here.[3] The incident occurred early in the course of the trial, in the remaining course of which no indication of any concern by the jurors affected, or any other juror,

from this event manifested itself. A juror did not subsequently hesitate to express concern about her impartiality when, just prior to closing, she came to the bench and informed the court that appellant lived six blocks away from her. The jury was polled after the verdict without incident. Indeed, although appellant speculates that the entire jury must have heard of the incident and been affected by it, the other jurors were out of the courtroom at the time and the incident was never alluded to again.

Appellant suggests that the period of time of deliberation indicates the likelihood that the affected jurors "did everything in their power to terminate the proceedings as quickly as possible." In fact, the deliberations lasted almost three hours. The government's case was a strong one, involving an undercover drug buy by an officer who made a positive identification. Appellant was stopped moments after the sale and seized after he fled in a four-block chase. Found in appellant's pocket was the marked $20 bill used to buy the cocaine. Indeed, as the government argues, if any prejudice resulted from the incident, it might be expected to flow against the government. It is difficult to see why a juror would retaliate against the trial judge

---

**2.** The entire summary contempt proceeding before the trial court, after the three jurors had given their numbers, was as follows:

THE COURT: Ladies, about a half an hour ago, a request was made to me to allow you to go down to get coffee. You were instructed, I believe, by the courtroom clerk that you would have five minutes. You could go down and get coffee but you will have to go back directly. We have been waiting here for approximately fifteen minutes. Do you recall being instructed that you have five minutes?
THE JUROR [sic]: Yes.
THE COURT: Did you?
THE JURORS [sic]: Yes, we were told and that was at 10:55.
THE COURT: It is now 11:15. That is twenty minutes, isn't it? That is not five minutes. I find each of you in contempt of Court. I will fine you twenty five bucks each. I will have orders drawn finding you in contempt of Court and directing you to pay twenty five dollars into the Court registry. When I say five minutes, I mean five minutes. I don't mean *twenty* minutes. Get the rest of the jury in here and seat them.

We do not on this appeal address any issues with respect to the proceedings that might be raised by the convicted jurors themselves. *Cf. Swisher v. United States*, 572 A.2d 85 (D.C.1990) (per curiam), decided two years after the proceedings in this case. As appellant himself acknowledges, "the issue here ... is not the legality of the court's contempt finding, but its impact upon the jury."

**3.** One of the reasons for requiring immediate objection at the trial court level is that such objection makes it possible for remedial measures to be taken. Here, for instance, the jurors, especially the three involved, could have been questioned in a *voir dire* action about any adverse effect the contempt proceedings might have had. *See Artisst v. United States*, 554 A.2d 327, 330–31 (D.C.1989) (mid-trial *voir dire* for bias). As we said many years ago, "[o]ne cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way." *Palmer Constr. Co. v. Patouillet*, 42 A.2d 273, 274 (D.C.1945) (citations omitted).

by convicting a defendant she would otherwise have voted to acquit.[4]

Aware that we do not have before us the full record of what led to the contempt proceeding, we nonetheless observe that it is possible that the trial judge's action here raised an issue which might have been avoidable. "We must make sure that the lamentations of the unsuccessful litigant [are] without foundation, either in fact or circumstance." *Allison v. United States*, 451 A.2d 877, 879 (D.C.1982), quoting *United States v. Chapman*, 158 F.2d 417, 421 (10th Cir.1946). There is absolutely no question that the trial judge has both the authority and the responsibility to maintain an orderly system of justice. *Swisher v. United States, supra*, 572 A.2d at 91; *In re Hunt*, 367 A.2d 155, 158 (D.C.1976), *cert. denied*, 434 U.S. 817, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977). It may well be that considerations or factors external to the cold record before us dictated the trial court's action here.[5] It still bears keeping in mind, as the Supreme Court has admonished and as we have recently reasserted, that the contempt power of trial judges is one that should be exercised with special circumspection. *Caldwell v. United States*, No. 87–891, 595 A.2d 961 (D.C. June 27, 1991), citing, *inter alia, Green v. United States*, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958); *see also, e.g., In re*

*Schwartz*, 391 A.2d 278, 281 (D.C.1978) ("[t]he power to punish summarily should be exercised sparingly"). For a trial judge to conduct, in the middle of an ongoing criminal trial, a side proceeding involving contempt charges against members of the very body which will pass upon the principal crime at issue is a step to be taken with all due caution.[6]

*Affirmed.*

SCHWELB, Associate Judge, concurring:

Any judge or attorney who has worked with a congested criminal calendar in an urban trial court can sympathize with the judge's frustration in this case when three jurors returned from a break fifteen minutes late. Such tardiness wastes the time and resources of the judge, the attorneys, the witnesses, the other jurors, the court staff, and the people associated with the myriad cases that are awaiting their turn for trial. Although judges often have to keep jurors waiting because non-trial matters take longer than expected,[1] they are nevertheless duty-bound to insist on punctuality on the part of the jurors. I also agree that trial judges must be accorded a reasonable amount of leeway to enforce punctuality requirements, without excessive micro-management from what they may perceive as the hallowed walls of appellate quasi-academia.

---

**4.** The only somewhat similar case cited to us is *Cofield v. State*, 247 Ga. 98, 274 S.E.2d 530 (1981). In that capital case, the trial court, in the presence of five other jurors who had already been selected, sentenced a member of the prospective jury panel to five days in jail for disrespect. Although disapproving of the trial court action, the appellate court found no error, especially in a absence of a timely objection or motion for a mistrial.

**5.** The bare appellate record standing alone reveals to us no self-evident explanation for the immediate resort to contempt proceedings. For instance, the record does not indicate that lack of punctuality had been a recurring problem in this trial or the spur for a special cautionary exhortation (other than the admonishment by the courtroom clerk prior to this particular coffee break). However, the record does not encompass all possibly relevant factors, such as the *voir dire* and opening remarks to the jurors or the precise dialogue between the court and

the jury leading to the coffee break and the wording of the admonition given to the jurors by the court clerk. See note 2 *supra*. The written order of contempt by the trial court states that the jurors were given "strict instructions" to return in five minutes.

**6.** The possible distractive effect upon a juror who has just been summarily convicted of criminal contempt without counsel and without an opportunity to defend or allocute may be compared with the general question quite routinely asked at *voir dire* whether, for any reason, a prospective juror thinks he or she could not give his or her full time and attention to the evidence.

**1.** Many judges try to take some of the sting out of unwelcome impositions on a jury's time by candidly warning jurors in advance that such eventualities may occur and that it is impossible to predict with accuracy exactly when it will be possible to resume the trial.

In this case, however, I am of the opinion that, so far as can be discerned from the record, the procedures utilized by the judge in this case were not only unfair to the tardy jurors but also potentially damaging to the integrity of the jury deliberations. The "trial record" reproduced in footnote 2 of the majority opinion reveals what I perceive to be fundamental flaws even in a summary proceeding. *See Swisher v. United States*, 572 A.2d 85, 90–94 (D.C.1990) (per curiam). The jurors were never told that they were charged with criminal contempt, or for that matter with any offense. They were never advised of their right to counsel. The judge did not accord them an opportunity to give their side of the story or to present a defense of any kind.[2] Once they had been adjudicated in criminal contempt, they were not permitted to allocute as to punishment, nor were they apprised of their right to appeal. *See* Super.Ct.Crim.R. 32(c)(1) and (3).[3]

As a result of the contempt citation, each of the three jurors now has a criminal conviction. If asked about a criminal record on an employment application form, he or she is bound to disclose it. There are other obvious consequences of a criminal conviction which I need not enumerate here. Suffice it to say that the contempt adjudications which followed the judge's abbreviated procedure may have done far more harm to these jurors than to make each of them twenty-five dollars poorer. The jurors may not have known of all the consequences of a criminal contempt adjudication, but then again they may. At the very least, they probably realized that they were in trouble and that they had not been given much of an opportunity to defend themselves or to tell the judge their side of the story.

It is true that we are not considering an appeal by the contemnors, perhaps in part because they were never told that they had the right to appeal. There are, however, potential consequences for the original parties to the case as well. During voir dire, prospective jurors are regularly asked if they have anything on their minds which would make it difficult for them to concentrate on the case. They are also routinely interrogated about any experience which they may have had with the criminal justice system. *See Ridley v. United States*, 134 U.S.App.D.C. 79, 81, 412 F.2d 1126, 1128 (1969) (per curiam). I have serious misgivings as to whether a juror who had just been held in criminal contempt after a proceeding of the kind that occurred here would be able to shake it all off at once and to focus his or her attention fully on the drug case against Hopkins. Moreover, it is most unlikely that a juror to whom this had happened would have been permitted to sit on the case if the incident had occurred during voir dire. Even assuming, *arguendo*, that a challenge for cause would not have been sustained, counsel would still have had the opportunity to utilize their peremptory strikes to avoid retaining potentially compromised jurors.

It seems to me that the problem might perhaps have been avoided if the judge had simply warned the jurors that they must come to court on time. Summary contempt, as the majority points out, should be invoked only as a last resort. If there had been prior developments, not revealed in the appellate record, which made a warning inadequate, then a procedure more compatible with and sensitive to the basic rights of the jurors, *see Swisher, supra*, ought to have been utilized. If the jurors felt that they were being treated fairly, it would have been less likely that their attentiveness and conscientiousness would be impaired during the remainder of the trial. Alternatively, the judge might have reproved the jurors on the spot, with or without a warning that he would further address the matter later, and might then have instituted contempt proceedings by notice

2. For all we can determine from the record, the courthouse elevator may have broken down. *See Swisher, supra*, 572 A.2d at 90 & n. 14; *In re Lamson*, 468 F.2d 551, 552 (1st Cir.1972) (per curiam).

3. It also appears that no award of costs was imposed pursuant to the Victims of Violent Crime Compensation Act, *see* D.C.Code § 3–414 (1988), although this omission redounded modestly to the jurors' advantage.

after the trial. See Super.Ct.Cr.R. 42(b). Had he proceeded in this manner, however, this might perhaps have left the sword of Damocles hanging over the jurors' heads, to the detriment of their concentration on the case which they were there to try.

Nevertheless, I agree with the majority that Hopkins did not adequately preserve the issue. He neither objected to the criminal contempt citations nor requested a mistrial. He apparently took his chance on the verdict of this jury; his counsel may even have thought that the contempt adjudications might have turned the jurors against authority, and therefore, perhaps, against the prosecution. Any error which the judge may have committed vis-a-vis the jurors was not "plain error" as to Hopkins. I therefore join Judge Steadman's opinion for the court.