Ferris N. BROWNER, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Rita A. WALKER, A/K/A Rita Browner, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 86–220, 86–221.

District of Columbia Court of Appeals.

Argued July 12, 1988.
Decided Nov. 8, 1988.

W. Edward Thompson, with whom J. Lincoln Woodard was on the brief, for appellants.

Edward E. Schwab, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before MACK and SCHWELB, Associate Judges, and PRYOR, Senior Judge.*

SCHWELB, Associate Judge:

> Where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute.

Lord Mansfield in *Floyer v. Edwards,* 1 Cowp. 112, 114–115, 98 Eng.Rep. 995, 996 (1774).

## I

Perhaps because so many of us have to live on credit and envy those who have the cash, it is fair to say that, rightly or wrongly, money lenders in general and usurers in particular have not been dealt with kindly in Holy Scripture, in literature, or in judicial rhetoric. The Bible warns us that "the borrower is servant to the lender,"[1] and instructs that

> if you lend money to any of my people with you who is poor ... you shall not exact interest from him.[2]

Shakespeare's character Polonius, speaking to his son Laertes about the ways of the world, provides unambiguous counsel on this subject:

> Neither a borrower nor a lender be.[3]

The Bard also introduces us to Shylock, perhaps the most famous (or infamous) money lender in all of fiction, who seeks to

---

\* Judge Pryor was Chief Judge of this court at the time of argument. His status changed to Senior Judge on November 2, 1988.

1. Proverbs, Chapter 2, Verse 7.

2. Exodus, Chapter 22, Verse 25.

3. Hamlet, Act I, Scene 3.

exact a pound of his anti-Semitic enemy's flesh as liquidated damages for failure to repay a loan.[4]

Not to be outdone, one court has described the practices which usury and loan sharking laws were designed to punish as "an actual, manifest, fearsomely violent evil," *People v. Ayers*, 109 Misc.2d 870, 875, 440 N.Y.S.2d 1019, 1023 (1981), and a second has commented that loan sharking is "one of the most heinous, virtually bloodsucking, criminal activities of all times." *People v. Fernandez*, 93 Misc.2d 127, 129, 402 N.Y.S.2d 940, 943 (1978).[5] Those who lend money at high interest rates sometimes become rich, but human nature being what it is, they seldom win the plaudits of the crowd or the goodwill of their less affluent fellow citizens.

In the present case, the principal question is whether the appellants Rita A. Walker and Ferris Browner, who are wife and husband, and who denied being in the business of money lending at all, were actually engaged in the criminal enterprise of making loans in a disguised form at legally impermissible rates and without a license. The trial judge, Honorable Fred L. McIntyre, sitting without a jury, found the evidence sufficient to establish beyond a reasonable doubt that the transactions in the record, although otherwise denominated by the defendants, were in reality loans of the prohibited character. We agree and affirm both appellants' convictions.

**II**

Ms. Walker and Mr. Browner were convicted of three counts each[6] of violating the Loan Sharking Act, D.C.Code § 26–701 (1981), which provides in pertinent part that

it shall be unlawful and illegal[7] to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than 6 per centum per annum is charged on any security of any kind, direct or collateral, tangible or intangible, without procuring a license.[8]

The controversy in this case arose out of a number of transactions in 1981 and 1982 between the appellants and several homeowners who were in financial difficulty and were facing imminent foreclosure on their homes. The Corporation Counsel charged that these transactions were loans at an interest rate that exceeded 6 per cent. The appellants claimed that, rather than making loans, they were purchasing homes, leasing them back, and providing the former homeowners with an option to repurchase.

The Corporation Counsel offered evidence which established that the appellants were the principals in a Virginia corporation named RAW & Associates, Inc.[9] They held themselves out as money lenders. They placed classified advertisements in the Washington Post in the newspaper's "MONEY TO LEND" columns. The advertisements read:

**4.** THE MERCHANT OF VENICE, Act I, Scene 3, and *passim.*

**5.** To avoid any misunderstanding, the rhetoric cited above was not directed at these defendants, who are charged only with making loans without a license and the New York opinions probably had reference to the kinds of loan sharks who use violence and intimidation to terrorize hapless debtors. There is no evidence of such conduct in the present case. Nothing in this opinion is intended to address the wisdom or lack thereof of economic or other criticisms of the usury laws. *See, e.g.,* Jordan and Warren, *The Uniform Consumer Credit Code,* 68 COLUMBIA L.REV. 387, 388 *et seq.* (1968).

**6.** Ms. Walker was found not guilty of three additional counts.

**7.** Presumably this redundancy was intended for emphasis.

**8.** Each of the informations also alleged that the defendants' conduct was in violation of 16 DCMR § 201.1, a regulation enacted by the pre-Home Rule Council which essentially prohibits the same conduct.

**9.** The name of the corporation apparently derives from Ms. Walker's initials. In an application by the corporation to do business in the District of Columbia, the corporate purpose was described as being

to carry out the mortgage brokerage business [and] to engage in the business of obtaining loans or financing on behalf of clients.

Nevertheless, RAW did not obtain the license required by § 26–701.

NEED MONEY?—Foreclosure help RAW 726-9303/387-4546.

They also distributed a circular entitled "YOUR FINANCIAL RESOURCE: RAW ASSOCIATES" which told prospective clients, among other things, that "Where banks stop, we start," "SERVICES PROVIDED: Financing money to lend," and other phrases to the effect that loans were available. The phrase "where banks stop, we start" was also used in an unsolicited letter to persons whose homes were being advertised for foreclosure.[10]

The trial judge found that the various homeowners who testified for the government contacted the defendants in response to these advertisements, seeking loans to save their homes, which were threatened with foreclosure. Instead of receiving loans, however, they were presented with and signed papers ostensibly conveying their property to Ms. Walker with a lease back and an option to repurchase within a year.

Although the transactions were denominated sales, the homeowners testified that they never intended to sell their property. Moreover, there was evidence that the appellants described the transactions to their clients as loans, and sometimes assured those clients who raised questions about what they were signing that the characterization of a transaction as a sale in the documents was solely a technicality, effected for the purpose of accommodating an accountant. In any event, most of the homeowners were understandably upset about their financial difficulties and the prospect of losing their homes, and even those with some years of college were less than diligent in reading what they were signing or otherwise protecting their own interests.

While the "sales" saved the homes from immediate foreclosure, they left the homeowners in an extremely precarious position. The homeowners were required to pay a monthly "rent" which was generally at least twice their former mortgage payment. In addition, in order to redeem their property after one year, they had to repay the money RAW had expended to make current the mortgage arrearages and other debts, as well as all costs incurred by RAW in conveying the property to Ms. Walker. If the homeowners were unable to make all of these payments, they lost the homes which they had asked appellants to help them save, equity and all.

The specific transactions as to which the government adduced testimony were all of the general character detailed above, although there were differences between the various (but all markedly one-sided) "bargains" struck.[11] Judge McIntyre's description of the experience of one family that dealt with the defendants is illustrative of what occurred:

> On or about November 15, 1982, Mrs. Julia Carroll visited the offices of RAW Associates to obtain a loan in order to assist her son whose house was subject to immediate foreclosure. The defendant Ferris Browner negotiated with Mrs. Carroll. Pursuant to the discussions, RAW made available funds in the amount of $4,591.18 to close out the pending foreclosure of the son's house. As part of the financing plan, Mrs. Carroll deeded her house over to the defendant Rita Walker under a one-year lease provision with an option to repurchase at the end of one year.
>
> During the one-year leasing period, Mrs. Carroll was required to pay monthly rental payments of $375.00 to RAW (in lieu of the $118.00 per month mortgage

10. The letter began:
    I am sorry to read that your property, by order of the court, is being foreclosed upon. We are foreclosure specialists....
    The reader can assess from the evidence in this case the genuineness of the defendants' professed sorrow.

11. The defendants' version of the arrangements with Mrs. Carroll (as well as with the other

homeowners) was capsulized by Mr. Browner as follows:
> We would buy real estate and we would allow the person that sold the property to us an opportunity to stay in the property so they wouldn't be uprooted.
>
>     \*    \*    \*    \*    \*    \*
>
> We never loaned anyone any money.

payments); and upon exercising the repurchase option, Mrs. Carroll would be obligated to pay the $4,591.18 arrearage payment, included therein being the cost of title examination, fire insurance, and the appraisal of the property.

At the time Mrs. Carroll entered into the alleged sale of her property to Rita Walker it had a value of $38,185 and was entirely free of debt except for the balance of the first mortgage in the amount of $1,600.00.

Thus, Mrs. Carroll conveyed property worth $38,185.00 for $6,988.18 (which included the arrearages, a $1,600.00 payment on her mortgage, fire insurance and various other amounts). The paltry sum expended by the appellants on Mrs. Carroll's behalf was even lower than the ostensible contract sale price of $8,100.00.

After hearing this evidence, as well as a prosecution expert's testimony that the effective interest rates charged by RAW ranged from 50% to 200%, the trial court found each appellant guilty of three counts of violating § 26–701. The appellants received suspended jail sentences and were placed on probation and ordered to make restitution, pay fines, and perform community service. These appeals followed.

### III

Before reaching the principal question in the case—whether the Loan Sharking Act reaches appellants' conduct—we address two procedural issues. The first, which was properly preserved for presentation on this appeal, is whether the defendants were improperly denied a jury trial. The second, first expressly raised as an independent basis for reversal during oral argument, is whether Judge McIntyre should have recused himself.

#### A. *Jury Trial.*

■ The maximum penalty for a violation of the Loan Sharking Act is imprisonment for thirty days, or a $200.00 fine, or both. As previously noted, appellants were also charged with violating 16 DCMR § 201.1, but this regulation prohibits like conduct and carries the same maximum penalty. There is no constitutional or statutory right to a jury trial for such an offense.

The Sixth Amendment to our Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury. Art. III, § 2, cl. 3 similarly states that "the trial of all crimes ... shall be by Jury." The right of trial by jury, however, does not extend to every criminal proceeding. *Jackson v. United States,* 498 A.2d 185, 187 (D.C.1985). So-called petty offenses were tried without juries both in England and in the Colonies, and have always been held to be exempt from the comprehensive language of the jury trial provisions of the Constitution. *Jackson, supra,* 498 A.2d at 188. The Supreme Court has held that a potential sentence of imprisonment for more than six months will take a criminal act out of the category of petty offense, and render it triable by jury. *Muniz v. Hoffman,* 422 U.S. 454, 476, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975) (criminal contempt); *Baldwin v. New York,* 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970).

There is also a statutory right to a jury trial in the District of Columbia for offenses carrying a fine of $300.00 or more or imprisonment for more than ninety days. D.C.Code § 16–705(b) (1981). This court has held that § 16–705(b) measures the limits of the right to a jury trial, and that offenses for which the maximum punishment is not above the statutory threshold are generally triable by the court. *Alston v. United States,* 509 A.2d 1129, 1130 n. 3 (D.C.1986) (shoplifting); *Dobkin v. District of Columbia,* 194 A.2d 657, 659 (D.C.1963) (baby brokering).

The maximum penalties under the Loan Sharking Act are well below the statutory threshold and the constitutional demarcation line as articulated in *Muniz* and *Baldwin.* Accordingly, unless there is some basis, other than the statutory maximum penalty, for demanding a jury, the defend-

ants were properly tried by the court.[12]

Appellants contend that they were entitled to a jury trial under *District of Columbia v. Colts,* 282 U.S. 63, 51 S.Ct. 52, 75 L.Ed. 177 (1935). In that case, the Supreme Court held that a defendant charged with reckless operation of a motor vehicle had a constitutional right to trial by jury in spite of the fact that the maximum term of imprisonment for a first offense was only thirty days. In *Colts,* however, the Court recognized that "there may be many offenses called petty offenses which do not rise to the degree of *crimes* within the meaning of Article III, and in respect of which Congress may dispense with a jury trial." 282 U.S. at 72–73, 51 S.Ct. at 53. (Emphasis in original.) The Court continued:

> Whether a given offense is to be classed as a crime, so as to require a jury trial, or as a petty offense, triable summarily without a jury, depends primarily upon the nature of the offense. The offense here charged is not merely *malum prohibitum,* but in its very nature is *malum in se.* It was an indictable offense at common law, *United States v. John Hart,* 1 Pet.C.C. 390, 392, when horses, instead of gasoline, constituted the motive power. The New Jersey court of Errors and Appeals, in *State v. Rodgers, supra*[13] has discussed the distinction between traffic offenses of a petty character, subject to summary pro-

ceedings without indictment and trial by jury, and those of a serious character, amounting to public nuisance indictable at common law; and its examination of the subject makes clear that the offense now under review is of the latter character.

282 U.S. at 73, 51 S.Ct. at 53 (emphasis in original).

*Colts* thus stands for the proposition that offenses which are *malum in se,* and which were indictable at common law, fall within the constitutional guarantee of trial by jury irrespective of the maximum punishment that can be imposed. In the present case, however, Ms. Walker and Mr. Browner were convicted of an offense which, however morally reprehensible it may be, is basically a licensing provision. *Reagan v. District of Columbia,* 41 App.D. C. 409 (1914). It is *malum prohibitum* rather than *malum in se. People v. Fernandez, supra,* 93 Misc.2d at 133, 402 N.Y. S.2d at 945. Unlike the defendant in *Colts,* appellants could not have been convicted of a similar crime at common law, for neither the licensing requirement nor the offense existed. The dispositive grounds upon which *Colts* was held to be entitled to a jury trial are therefore inapplicable to this prosecution.[14]

Accordingly, we conclude that the trial of the appellants by the court, sitting without

---

**12.** The defendants claim that they were entitled to a jury trial because several counts were joined in the information filed against them, and that the cumulative potential penalties for all counts were arguably in excess of those which can be imposed for a petty offense. This contention was squarely rejected in *Scott v. District of Columbia,* 122 A.2d 579, 581 (D.C.1956), where this court stated:

> We see no reason why consolidation of a number of petty offenses in one information should confer on the defendant a right he would not have if the charges were brought in separate informations.

See also *Olevsky v. District of Columbia,* 548 A.2d 78 (D.C.1988).

**13.** 91 N.J.L. 212, 214, 102 A. 433, 435 (1917).

**14.** Appellants cite *Chew v. District of Columbia,* 42 App.D.C. 410 (1914) as standing for the proposition that they are entitled to a jury trial. In

*Chew,* the court affirmed the defendant's conviction for loan sharking after he had been found guilty by a jury. The principal issue on appeal was whether the loan sharking statute should be liberally construed, despite its penal character. The court held that it should. Nothing in Chief Justice Shepard's opinion for the court suggests that the prosecution opposed trial by jury, or that either the Police Court or the appellate court ever had occasion to address the issue whether the defendant had that right. Under these circumstances we find apposite the following observation by the Supreme Court in *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925):

> The most that can be said is that the point was in the [case] if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court or ruled upon, are not to be considered as having been so decided as to constitute precedents.

a jury, did not deprive them of any constitutional or statutory right.

### B. *Recusal.*

■ Appellants' contention that Judge McIntyre was prejudiced against them and should have disqualified himself is untimely and altogether lacking in merit.

In their brief on appeal, appellants contend that

asking the court below to grant appellants a jury trial was also asking the trial judge to recuse himself because Judge McIntyre had just sat as a trial judge in a two week jury trial of appellants in ... Criminal Nos. 659–84 and ... 660–84.

They argued that

there is no way the trial judge in this case could have been unprejudiced because he had heard all the facts in the previous trial with the same witnesses on basically the same issue. That is the more reason the trial below was not fair and the reason this court should grant appellants a jury trial.

At oral argument, counsel expressly asked that the convictions be reversed for alleged bias of the trial judge. Appellants never filed an affidavit of prejudice against Judge McIntyre in the trial court. Failure to file such an affidavit in timely fashion, accompanied by a certificate by counsel of record stating that it is made in good faith, defeats the charge of bias. *See* Super.Ct. Civ.R. 63–I, made applicable to criminal cases by Super.Ct.Crim.R. 57(a); *United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir.1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); *Martin–Trigona v. Shiff*, 600 F.Supp. 1184, 1187 (D.D.C.1984).[15] Indeed, the lack of a certificate of good faith signed by counsel is, standing alone, a sufficient reason to deny the motion. *Burt v. First American Bank*, 490 A.2d 182, 187 (D.C.1985). The

issue is therefore reviewable in this court, if at all, only for "plain error." *In re Thompson*, 419 A.2d 993, 994 n. 1 (D.C. 1980). Counsel for appellants having acknowledged that he did not raise the issue before the trial judge at all, so that Judge McIntyre was never afforded the opportunity to consider the belated allegations of prejudice, review even on a plain error standard is unduly generous to appellants.

■ We go beyond appellants' procedural default only because the allegations against Judge McIntyre in this case are so completely devoid of merit that it would do him an injustice to dismiss them on technical grounds and leave the meritless but unanswered charges hanging. A trial judge's familiarity with a party and with the party's legal difficulties through prior judicial hearings does not warrant recusal. *Gregory v. United States*, 393 A.2d 132, 143 (D.C.1978). Although we agree with Judge Wilkey that

the disciplined judicial mind should not be subjected to any unnecessary strain; even the most austere intellect has a sub-conscious,

*United States v. Walker*, 154 U.S.App.D.C. 6, 8, 473 F.2d 136, 138 (1972), appellants have identified nothing in this record,[16] and we have found nothing, which raises the slightest doubt as to Judge McIntyre's impartiality. Accordingly, we find no bias whatever on Judge McIntyre's part and see no reason for recusal, *sua sponte* or otherwise. There was no error, and therefore no plain error.

### IV

■ Turning to the substantive issue, appellants' principal contention is that they were not lending money and were therefore not subject to the proscriptions of the Loan Sharking Act. We agree with the government, however, that this is not a

---

**15.** The federal decisions cited construe 28 U.S.C. § 144. Civil Rule 63–I is substantially identical to that statute, and decisions under the federal statute provide guidance as to the proper construction of the Rule. *In re Bell*, 373 A.2d 232 (D.C.1977).

**16.** Legal rulings against appellants, of course, do not constitute grounds for recusal, for any

legal issue but a factual one,[17] and that Judge McIntyre's findings have ample support in the record. Moreover, the courts have consistently held that the question whether usury and loan sharking laws, civil or criminal, apply to a particular transaction depends on the substance of that transaction and not on its form. Accordingly, the Loan Sharking Act may not be avoided by attempting to disguise the character of the arrangement, or by denominating what is really a loan as something else. Finally, the authorities and contentions relied upon by appellants do not sustain their position.

A. Judge McIntyre's findings in this case are based squarely on the credibility of the witnesses and on the inferences drawn from their testimony by the judge as trier of fact. Under these circumstances, his findings cannot be disturbed unless they are shown to be without evidentiary support and plainly wrong. D.C.Code § 17–305(a) (1981); *Nche v. United States,* 526 A.2d 23, 24 (D.C.1987).

The principal contested issue, both in the trial court and on appeal, was whether the purported sales were really sham transactions that masked loans. There is overwhelming support in the record for the judge's resolution of that question in the affirmative. Each of the homeowners was drawn to the appellants by advertising which promised the availability of "money to lend" to stop imminent foreclosure. When the homeowners asked for the loans which they believed that the advertisements were describing, and then posed questions about the form of the transactions, the appellants couched their answers to these questions in language which confirmed to the complainants that they were receiving the very loans for which they had come. The appellants often simply calmed the inquiring homeowners' fears by pretending that it was usual practice, perhaps required by the accountant, to sign instruments transferring title to the homes. The trial court credited the homeowners' testi-

mony and gave a comprehensive and persuasive explanation for having done so. An appellate court may not disregard the reasoned resolution of issues of credibility on the part of the trier of fact.

Moreover, if the transactions were in fact sales, as appellants contend, they were surely most extraordinary ones. When a homeowner sells his home, which is usually his most valuable possession, one would expect at least some measure of bargaining over the sales price. Here, there was none. In each instance, what the appellants characterize as the "sales" price bore no relation whatever to the value of the equity. It is absurd to suggest that Mrs. Carroll would knowingly sell her home, in which she had an equity of more than $36,500.00, for $8,100.00. None of the "sellers" had placed his or her home on the market or expressed the slightest interest in selling it. Each "seller" remained in possession after the purported sale, and appellants were indeed depicting their service as one that would enable their clients to "save" their homes from foreclosure. Although the transaction also lacked one of the common characteristics of a loan—an evaluation of the borrower's credit—no such investigation was needed because the home itself, which in each case was worth far more than the amount expended by the appellants, served as their security. It was therefore altogether reasonable for the trial judge to find that the depiction of each of these transactions as a sale and lease back was a transparent sham which masked an unlawful loan.

■ B. Although the term "loan sharking" may convey an image of armed toughs who leave the broken knee-caps of victimized borrowers in their wake, statutes like our Loan Sharking Act reach the "white collar" violator as well as his gangland counterpart. As Chief Judge Cooke stated in his thoughtful concurring opinion about

---

prejudice must stem from an extrajudicial source. *Burt, supra,* 490 A.2d at 188.

17. Whether a particular arrangement is a "cover for usury" is a question of fact. *Hammelburger v. Foursome Inn Corp.,* 54 N.Y.2d 580, 595, 446 N.Y.S.2d 917, 925, 431 N.E.2d 278, 286 (1981).

usuary laws [18] in *Hammelburger v. Foursome Inn Corp., supra,* 54 N.Y.2d at 591–92, 446 N.Y.S.2d at 926, 431 N.E.2d at 287 (1981):

Two aspects of criminal usury are abhorrent to public policy. First, the excessive interest charged is considered repulsive to our values. It is nothing more than a thoroughly unscrupulous exploitation of another's vulnerability. Society will not condone one person's taking unfair advantage of another's weaker position (see, *e.g., Barnard v. Gantz,* 140 N.Y. 249, 35 N.E. 430 [undue influence]; Restatement, Contracts 2d § 177). Second, the exaction of criminally excessive interest is, in the public's mind, inextricably linked with violent methods of collecting delinquent debts.

\* \* \* \* \* \*

It should be noted that in criminalizing these usurious practices, the Legislature was not only concerned with the stereotypical loan shark accompanied by a strong-arm enforcer. The Legislature specifically recognized that the criminal usurer often "conduct[s] his business wholly within the law" (as it then existed), taking advantage of legal loopholes and relying on reputation rather than actual intimidation to collect loans (N.Y. Legis.Ann., 1965, p. 48). Thus, it can only be concluded that the Legislature intended to penalize those usurious lenders who operate "under high-sounding business names, with offices and other trappings of legitimacy" (*id.*).

"White collar" loan sharking is often characterized by the use of labels designed to mask the character of the transaction, but courts do not allow themselves to be hoodwinked by such disguises. *See, e.g., Schneider v. Phelps,* 41 N.Y.2d 238, 243, 391 N.Y.S.2d 568, 571, 359 N.E.2d 1361, 1364–65 (1977) (under statute which contained an exemption for loans to corpora-

tions, court may pierce the corporate veil to avoid evasion by lenders who arranged for borrowers to incorporate). Indeed, in addressing the very kinds of arrangements at issue here, the courts have held that a transaction which is a sale in form is to be treated as a loan when this more accurately reflects the substance of the arrangement. As the court stated in one such case, *Long v. Storms,* 50 Or.App. 39, 49, 622 P.2d 731, 738 (1981),

the undisputed evidence shows that defendants were financially distressed at the time of the transaction, that the purported sale price was substantially less than the fair market value of the property, that defendants remained in possession of the property, that plaintiff did not obtain an appraisal on the property until after the purported conveyance, and that there was no bargaining between the parties as to the consideration recited in the deed.... Finally, the form of the transaction was a deed absolute in form accompanied by an option to repurchase. That plaintiff did not require defendants to fill out a credit application does not persuade us that the transaction was a sale, not a loan. Plaintiff knew that defendants were financially distressed and had been unable to obtain a loan. Further, he had defendants' house as security. The sum of these facts squares clearly with our conclusion that the transaction between the parties constituted a loan with a security interest.

*Accord: Moran v. Kenai Towing and Salvage, Inc.,* 523 P.2d 1237, 1243 (Alaska 1974); *Kawauchi v. Tabata,* 49 Haw. 160, 413 P.2d 221, 232 (1966); *Cannon v. Seattle Title Trust Co.,* 142 Wash. 213, 216–217, 252 P. 699, 700–701 (1927).

The foregoing authorities involve civil proceedings, which might arguably be thought inapplicable to the construction of a criminal statute.[19] The decisions interpreting criminal enactments which prohibit

---

**18.** The appellants in this case were not convicted of usury but of making unlicensed loans. Given the nature of the proof, however, Chief Judge Cooke's comments appear to us somewhat apposite by analogy.

**19.** In *Reagan v. District of Columbia, supra,* 41 App.D.C. at 412, the court, in broadly construing the word "security" in what was then the newly enacted Loan Sharking Act, declined to apply the doctrine that penal statutes are to be strictly construed:

the kind of conduct at issue in this case, however, likewise eschew form to reach the substance of the transaction. In *McWhite v. State*, 143 Tenn. 222, 226, 226 S.W. 542, 543 (1921), which involved a criminal prosecution under Tennessee's usury laws, the court, in holding that a purported assignment of future wages masked a secured usurious loan, stated that it is "well settled by our cases that in all transactions of this character the court will disregard the form of the matter, and will look to its real substance." *Accord: People v. J.M. Adams & Co.*, 112 Cal.App.Supp. 769, 295 P. 511, 512 (1931). We therefore hold that the criminal character of these proceedings does not defeat coverage under the Loan Sharking Act.

■ C. Appellants contend that the homeowners, some of whom were comparatively well educated, signed documents clearly identifying the arrangements in question as sales and leasebacks, and that under these circumstances the trial judge erred in finding that the transactions were loans. Although it is true that, viewed from the calm and detached perspective of an appellate tribunal, the actions of the complainants might well be described as improvident, that is not a defense to the instant charges.

The class of persons protected by laws proscribing usury and loan sharking consists, essentially by definition, of individuals who, as a result of their financial plight, have improvidently made agreements so unconscionable that their enforcement is unwarranted. As the New York Court of Appeals explained in *Schneider v. Phelps, supra,* 41 N.Y.2d at 243, 391 N.Y.S.2d at 571, 359 N.E.2d at 1365.

The purpose of usury laws, from time immemorial, has been to protect desperately poor people from the consequences of their own desperation. Law-making authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to almost any conditions of the lender and to consent to even the most improvident loans. Lenders, with the money, have all the leverage; borrowers, in dire need of money, have none.

Although the present prosecutions were brought under the loan sharking statute, the trial judge found that here, as in usury cases, the appellants used their superior economic power to induce desperate individuals who faced imminent foreclosure to sign disguised loan agreements at a rate of interest far in excess of that permitted by law. The lender's transgression in such a situation is not excused by his victim's ill-advised agreement to the oppressive terms offered.

We have considered all of the appellants' remaining contentions and find them to be lacking in merit.[20] Congress and the City Council have prohibited the kinds of exploitive and unconscionable practices, designed to take financial advantage of human desperation, which are reflected in this record. The trial judge correctly identified these practices for what they were, and appellants' convictions must be and each is hereby

AFFIRMED.

---

It is urged that this is a penal statute, and, as such, the somewhat obsolete rule of strict construction should be invoked. It is a remedial act, and should be liberally construed, with the view of giving force and effect to the intent of Congress.
*Accord: Chew v. District of Columbia, supra,* 42 App.D.C. at 412. Since the doctrine which the court deemed obsolete in 1914 is still part of our jurisprudence almost three quarters of a century later, *Moore v. United States,* 508 A.2d 924, 925–926 (D.C.1986) (*per curiam*), and since in our view the trial judge could properly find the conduct in question to contravene the statute even if the rule of lenity is applied, we do not place our reliance on the characterization of

our criminal loan sharking statute in *Reagan* and *Chew* as remedial rather than penal.

**20.** Appellants contend that the criminal proscriptions of the Loan Sharking Act apply only to loans of $200.00 or less. There is, however, nothing in the language of § 26–701 or in the parallel Regulation, 16 DCMR § 201.1, to support such a limitation. Moreover, appellants' contention is foreclosed by the decision in *Hartman v. Lubar,* 77 U.S.App.D.C. 95, 133 F.2d 44 (1942), in which the principal authorities relied upon by appellants are carefully explored and distinguished.