**Mickey W. SWISHER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88-498.

District of Columbia Court of Appeals.

Submitted Jan. 4, 1990.
Decided March 22, 1990.

Christian J. Camenisch, Stanford, Ky., appointed by the court, was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., Washington, D.C., with whom John R. Fisher and Henry Hoberman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before BELSON and SCHWELB, Associate Judges, and REILLY, Senior Judge.

PER CURIAM:

Appellant Mickey W. Swisher first learned that he was charged with criminal contempt of court when the trial judge found him guilty of that offense. He was convicted and sentenced to imprisonment without having had the opportunity to discuss his case with his attorney. Concluding that Swisher's substantial rights were violated, we reverse his conviction.

I

Swisher, a service station attendant who was then nineteen years of age, was arrested on March 4, 1988 and charged with unlawful possession of PCP and marijuana, in violation of D.C.Code § 33–541(d) (1988). It appears from the court file that he was one of three occupants of an automobile which had been stopped by police for a traffic infraction. Drugs and alleged paraphernalia were recovered from the vehicle, and criminal informations were filed against all three men.

A status hearing was held on March 29, 1988, and trial was scheduled for May 4, 1988 at 9:00 a.m. At 8:20 a.m. on the trial date, however, a female friend of Swisher telephoned the Pretrial Services Agency (PSA) and stated that Swisher would be unable to appear on that date because he was in West Virginia on family business, the exact nature of which she did not know. The PSA reported the contact to the trial

judge, who issued a bench warrant for Swisher's arrest.

The following day, at about 1:00 p.m., Swisher came to the PSA office and requested assistance in resolving the matter. He explained that his grandfather had died the previous week and that he had been obliged to return to West Virginia because of "family problems." The PSA reported these events to the judge, and Swisher was directed to the courtroom.

The judge called the case, apparently for the purpose of resolving what should be done about the outstanding bench warrant.[1] By coincidence, Christian Camenisch, Esq., Swisher's counsel in the underlying drug case, was also representing one Maurice K. Gaston, the individual who was then on trial before the same judge. Mr. Camenisch was thus able to note his appearance on Swisher's behalf when the latter's case was called.

The judge stated for the record that a bench warrant had been issued. For the benefit of counsel, he summarized the two PSA memoranda. He stated, and the prosecutor confirmed, that the prosecution had been ready for trial the previous day, and that the government had incurred the expense of bringing its witnesses to court. The judge invited Mr. Camenisch to comment on Swisher's behalf.

Mr. Camenisch told the judge that he had not had the opportunity to speak with Mr. Swisher or to "delve into the circumstances of [his] absence." He noted, however, that both he and the judge had been in trial in the *Gaston* case on the previous day, that Swisher's case could not have gone to trial, and that there was therefore no "real prejudice" to the government.[2] He asked the judge to quash the bench warrant and to set a new trial date. The prosecutor agreed with defense counsel's proposal, but argued that Swisher's failure to appear demonstrated that he was unreliable,[3] and asked that the defendant be "held" pending trial.

Although it is readily apparent from the foregoing recitation that both counsel were treating the proceeding as one relating to the resolution of the bench warrant and possible modification of conditions of release, the case suddenly took on a different dimension:

THE COURT: All right, Mr. Swisher, is there anything you want to say? Bear in mind, of course, that anything you say can be used against you.

MR. SWISHER: Yes, sir. I had to go home, because my grandfather died and it was an expense to you, and it was a great expense to me to lose my grandfather. And, I wanted to go home and see him one last time before he was put in the ground.

THE COURT: Well, unfortunately sir, when—

MR. SWISHER: And, I was not able to make it because my family was just falling apart. And, I just had to be there. I tried to get hold of Mr. Camenisch here, and his line's been busy, and I had my friends down here try, and I've tried from home, and the line's been busy until 12:00 at night.

THE COURT: Unfortunately sir, when you have a criminal case pending, it has to take priority over everything else.

I believe that the defendant's non-appearance, [was] willful contempt of court in the presence of the court, and accordingly we will add Count D, Contempt of Court. And I find the Defendant guilty of Contempt of Court.

I'll hear from you, Mr. Camenisch, before I sentence him.

---

1. The government asserts in its brief on appeal that after Swisher arrived in the courtroom, the judge "conducted a hearing to determine whether appellant should be held in contempt of court." In fact, the purpose of the hearing was never so identified, except retroactively when Swisher was found guilty of criminal contempt.

2. The *Gaston* case was instituted in January 1987. It was thus more than a year older than the *Swisher* case, and would undoubtedly have been given trial priority over *Swisher* even if appellant had been present.

3. Mr. Camenisch responded to this contention by stating that he thought his client was regularly employed.

As we have noted at the outset, the adjudication was the first indication from anyone that a contempt proceeding was being held.

Following the judge's finding, Mr. Camenisch again referred to his client's grandfather's funeral, and stated that "I don't think he was acting in any intentionally contemptuous way." The judge responded that

I've already found that he was.[4] I'm talking about sentencing at this point.

When the judge invited counsel to allocute with respect to the sentence, Mr. Camenisch once again protested the procedure which had been utilized:

MR. CAMENISCH: Well, your Honor, I feel that I've been put at a great disadvantage. You're calling this case, and then the Court finding my client guilty, when I really haven't even had a chance to advise him not to speak up and all that, and I just think it's not right, and I feel like, rather than go forward like that, he should say nothing under the circumstances, and I just think that I've been put in a very bad position here.

THE COURT: All right. So, you have nothing to say?

MR. CAMENISCH: Well, Your Honor, I really didn't have an opportunity to consult with him prior to calling this case.

THE COURT: That, of course, is also another risk— [5]

Mr. Camenisch then briefly allocuted on Swisher's behalf. Invited by the judge to speak for the government, the prosecutor deferred to the discretion of the court. Asked if he wished to say anything, Swisher stated

No, I'm very sorry that I missed it, and I will never do it again.

The judge sentenced him to five days in jail.[6] This appeal followed.[7]

## II

On appeal, Swisher contends that his conviction should be reversed for evidentiary insufficiency and procedural error. We conclude that the evidence was sufficient but that the process was fatally flawed.

### A. *Evidentiary insufficiency.*

We first address Swisher's contention that the evidence against him was insuffi-

---

4. Reaffirming his adjudication, the judge said:
   He made a choice, he wanted to go see his grandfather instead of coming to court. I can sympathize with that, but it's a willful failure, and when you get entangled in the criminal justice system, allegedly, I assume for Mr. Swisher, driving into D.C. to take advantage of those open air drug markets, and provide that market, making this city a shambles, then you have to be willing to abide by the consequences of being required to show up in court on time.

5. The judge was apparently alluding to the "risk" described in his remarks quoted in footnote 4.

6. The proceedings concluded as follows:
   MR. SWISHER: Is there any way I can consult with—
   MR. CAMENISCH: He has a job, your Honor, that he had to report to.
   THE COURT: I'm sorry, but once again, the Court comes first. Five days sentence....
       *     *     *     *     *     *
   MR. CAMENISCH: Your Honor, will the Court reconsider the imposing of that sentence. I don't think Mr. Swisher has ever been involved with the law before. And, I don't think that—

   THE COURT: Listen, it's done. Thank you. And, I think you're going to see more of it from the judges of this court for people who come into the district from the outside.

7. On September 1, 1988, Judge Wolf issued a written "Criminal Contempt Ruling" in conformity with Super.Ct.Crim.R. 42(a). After essentially restating his oral fact findings, the judge wrote as follows:
   The court is not helpless when a criminal defendant does not appear at the beginning of a trial as directed; the proper exercise of its contempt power, after an appropriate factual inquiry, is the prescribed method of punishing such a defendant. *Campbell v. United States,* 295 A.2d 498 (D.C.1972). A defendant who conceded in open court that he knowingly violated a condition of his release in effect confessed to contemptuous conduct. *Matter of Wiggins,* 359 A.2d 579 (D.C.1976). The elements of criminal contempt are: "(1) Willful disobedience; (2) of a court order; ... (3) causing an obstruction of the orderly administration of justice." *In Re Thompson,* 454 A.2d 1324, 1326 (D.C.1982). The court finds that all three elements of contempt were proved beyond a reasonable doubt by Mr. Swisher's conduct.

cient to support his conviction. If that position were correct, retrial would be barred as a matter of law by the Double Jeopardy Clause. *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *see generally Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 290–91, 102 L.Ed.2d 265 (1988).

The elements of criminal contempt are (1) willful disobedience (2) of a court order (3) causing an obstruction of the orderly administration of justice. *In re Thompson*, 454 A.2d 1324, 1326 (D.C.1982) (*per curiam*). The offense requires both a contemptuous act and a wrongful state of mind. *In re Gorfkle*, 444 A.2d 934, 939–40 (D.C.1982).

Swisher apparently challenges the sufficiency of the proof of the first and third elements. He claims that his conduct does not establish "a willful attempt to show disrespect for the court or to disrupt the proceedings." *See Warrick v. United States*, 528 A.2d 438, 443–44 (D.C.1987).[8]

Swisher acknowledged in open court, however, that he failed to appear because "I *wanted* to go home and see [my grandfather] one last time before he was put in the ground." He essentially admitted that he made a deliberate choice.[9] Viewing the evidence, as we must, in the light most favorable to the government, *Irick v. United States*, 565 A.2d 26, 30 (D.C.1989), and recognizing that the trial judge's findings cannot be disturbed unless they are shown to be without evidentiary support or plainly wrong, *Browner v. District of Columbia*, 549 A.2d 1107, 1114 (D.C.1988), we conclude that there was ample evidence of willfulness.[10] A defendant's unexcused failure to appear for trial on the scheduled date causes an obstruction of the orderly administration of justice. *See In re Thompson, supra*, 454 A.2d at 1327.[11]

This court has described the use of criminal contempt sanctions as "a prescribed method of punishing a defendant who fails to appear for trial." *Campbell v. United States*, 295 A.2d 498, 500 n. 8 (D.C.1972). The actual disruption in the present case

8. At the status hearing, Swisher signed a Notice to Return to Court on the trial date. The notice advised him that "failure to appear promptly may result in the issuance of a warrant for your arrest." He was also presumably advised, in conformity with uniform Superior Court practice, of the penalties for failure to appear pursuant to the Bail Reform Act, D.C.Code § 23–1327 (1989). There is no indication in the record, however, that he was ordered, in so many words, to appear on May 4, 1988.

Swisher has not raised, either in the trial court or on appeal, the question whether there was any court order for him to disobey. Judge Wolf found, at least implicitly, that the Notice to Return to Court was a court order, and we are disposed neither to raise the issue *sua sponte* nor to conclude that such a finding was "plain error." *Cf. D.D. v. M.T.*, 550 A.2d 37, 48–49 (D.C.1988).

9. Willfulness may also properly be inferred from Swisher's failure to appear for trial after having been warned that his attendance was required. *See Raymond v. United States*, 396 A.2d 975, 976–77 (D.C.1979) (in prosecution under Bail Reform Act, proof that defendant received notice of his trial and failed to appear supports permissible statutory inference of willfulness); *In re Schaeffer*, 370 A.2d 1362, 1364 (D.C.1977) (*per curiam*) (willfulness inferred from attorney's failure to return to courtroom).

10. Swisher's communication to the court, through a friend, that he would not be present, as well as his prompt surrender, may both be worthy of consideration in mitigation of the offense, but cannot alter the fact that he absented himself without the prior consent of the court.

11. The intrinsic mischief occasioned by the unanticipated absence of a principal actor in the proceedings has especially serious consequences in multi-defendant cases such as the one in which Swisher was scheduled for trial. The defendant's failure to appear not only frustrates the schedules of the judge and his staff, the prosecutor, and his own counsel, but also inconveniences his codefendants and their attorneys. Plea offers in such cases are often "wired," *i.e.*, contingent on all defendants accepting the government's offer, and a single defendant's failure to appear may stymie several guilty pleas.

In Swisher's case, one codefendant had entered a guilty plea on the trial date. The record does not disclose if the plea offer to that individual had been "unwired" or if his plea was to the information. If Swisher had been present and prepared to plead—and his counsel indicated that a plea was a strong possibility—then the two pleas could have been taken together, a procedure which would have conserved the time and resources of all concerned.

may not have been great,[12] but the judge did not err in finding it sufficient to support Swisher's conviction for criminal contempt.

■ Although Swisher has not so characterized it, his position on the merits parallels the "defense of necessity." Translated into legal terminology, his statement to the court suggested that he failed to come to court because "the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from [his] breach of the law." *Griffin v. United States,* 447 A.2d 776, 777 (D.C.1982), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). We need not determine whether *any* family emergency, *e.g.,* the resuscitation of a spouse or a child who suffered a heart attack, *see In re Lamson,* 468 F.2d 551, 552 (1st Cir.1972) (*per curiam* ), would be sufficient to sustain the necessity defense, which is surely one of last resort. We hold only that the desire to attend the funeral of one's grandfather, however understandable and even praiseworthy it may be, does not, without more, constitute "necessity."[13] *Cf. United States v. Anonymous,* 215 F.Supp. 111, 113–14 (E.D.Tenn. 1963) (attorney held in criminal contempt when he failed to appear for trial because there was a fire at a building in which he owned an interest; "great burden" on attorney caused by fire considered in mitigation only).

B. *Procedural issues.*

Swisher claims that the summary proceedings against him were lacking in basic

fairness. We find substantial merit in his contention.

Super.Ct.Crim.R. 42(a), which governs the prosecution of summary contempts, provides as follows:

SUMMARY DISPOSITION. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

Swisher argues that this rule has no application to the present circumstances, thereby raising the question whether a person who was found guilty of criminal contempt for being in West Virginia when he was supposed to be in the courtroom in Washington, D.C., committed the alleged offense in the "actual presence of the court" within the meaning of Rule 42(a).

■ This issue has most frequently arisen in the context of criminal contempt proceedings against attorneys who have failed to appear in court at the time prescribed. Most of the courts in other jurisdictions which have been confronted with this question have concluded that this type of contempt has not been committed in the presence of the court and should not be dealt with summarily because, although the judge can determine by personal observation that the contemnor is not present, he or she cannot know without receiving additional information from sources outside the courtroom whether the contemnor's absence was willful, negligent or unavoidable. *See, e.g., In re Lamson, supra,* 468 F.2d at 552–53;[14] *Annotation: Attorney's failure*

---

**12.** The trial judge indicated that, even though he was in trial in the *Gaston* case, he might have been able to "certify" Swisher's trial to another judge. This would, in fact, have been impossible, because Mr. Camenisch was counsel both for Gaston and for Swisher and could not defend both men before different judges at the same time.

**13.** If a timely motion for a continuance had been made, the judge might appropriately have granted it for humanitarian reasons.

**14.** As the court said in *Lamson, supra,* 468 F.2d at 552:

The failure to be present in court at the appointed time is obvious to the court. Yet, while the absence, if it can be called "conduct", is in the presence of the court in a semantic sense, the presence of the offender is in the court's absence. As to the reasons for the presence elsewhere, they may be good ones, depending on witnesses—the security officer, some of the demonstrators or bystanders, the heart attack victim, or building maintenance personnel—or on other information which the tardy attorney could produce.

These are the kinds of events which impress upon us that a failure to appear on time may

to attend court, or tardiness, as contempt, 13 A.L.R.4th 122, 159–75 (1982 & Supp.1989). In the District of Columbia, however, the attorney's absence is deemed to have occurred in the judge's presence and, with some substantial limitations discussed at pp. 91–92, *infra*, summary contempt proceedings in such cases have been sustained. *See, e.g., In re Gratehouse*, 415 A.2d 1388, 1391 n. 4 (D.C.1980) (*per curiam*); *In re Rosen*, 315 A.2d 151, 152–53 (D.C.) (*per curiam*), *cert. denied*, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974).[15] Since it has also been held that in a summary proceeding for contempt committed in the presence of the court, the contemnor has no right to notice of the charges, *see Ex parte Terry*, 128 U.S. 289, 306–07, 9 S.Ct. 77, 80, 32 L.Ed. 405 (1888), or to representation by counsel, *In re Ellis*, 264 A.2d 300, 305 (D.C.1970), the government argues that the trial judge's conduct of the proceedings in the present case was entirely appropriate.

■ We recognize, however, that certain kinds of contemptuous acts are susceptible to more summary treatment than others. The classic summary contempt cases, in which the courts have dispensed even with otherwise basic rights such as notice of the charges and representation by counsel, have involved disruptive conduct in the courtroom which the judge has personally witnessed from beginning to end. *See, e.g., Ex parte Terry, supra* (assault on marshal in the presence of the court); *Ellis, supra* (litigant insulted the judge, shouted, and banged his fist). All of the relevant events

under such circumstances having occurred within the judge's sight and hearing, there is little, if anything, that notice of the charges or representation by counsel could reasonably be expected to accomplish. Moreover, where there has been a disturbance in the courtroom, speedy punishment may be necessary in order to achieve summary vindication of the court's dignity and authority. *Harris v. United States*, 382 U.S. 162, 164, 86 S.Ct. 352, 354, 15 L.Ed.2d 240 (1965); *see also In re Oliver*, 333 U.S. 257, 274, 68 S.Ct. 499, 508, 92 L.Ed. 682 (1948); *Cooke v. United States*, 267 U.S. 517, 534, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925). Rights otherwise available to criminal defendants need not be honored in such cases because the contemnor's conduct has posed such an open threat to the orderly procedure of the court, and such a flagrant defiance of the person and presence of the judge that, were it not instantly suppressed and punished, demoralization of the court's authority would follow. *Cooke, supra*, 267 U.S. at 536, 45 S.Ct. at 394.

Neither of these special circumstances— that the judge saw and heard everything and that immediate action is imperative— applies where the contempt proceeding is against an absent lawyer or witness or juror or defendant. The difference between the two kinds of cases has been recognized in the jurisdictions which follow the minority "absence occurs in the presence of the court" rule, including the District of Columbia. In sustaining this court's adoption of that minority rule, the United States Court of Appeals for this

often only be explained by witnesses who may not be immediately available or by more than three hours preparation by the offender. An opportunity to summon the witnesses or obtain material necessary to the defense seems only fair.

15. We assume, *arguendo*, that the case law holding that the contemnor's absence occurs in the presence of the court applies to criminal defendants as well as to attorneys. *See In re Kirk*, 413 A.2d 928, 930 (D.C.1980) (*per curiam*) (affirming criminal contempt convictions of witnesses, entered after show cause hearing, for failure to comply with subpoena; court cited "absent attorney" cases as analogous precedent); *Aron v. Huttoe*, 258 So.2d 272, 274 (Fla.Dist.Ct. App.) (summary contempt proceedings sus-

tained against witness who failed to respond to subpoena; court recognized, however, that "a logical argument has been advanced by appellant that this contempt was not committed in the actual presence of the court"), *cert. dismissed per curiam*, 265 So.2d 699 (Fla.1972). *But cf. In re Allis*, 531 F.2d 1391, 1392–93 (9th Cir.) (opportunity to confer with counsel for ten minutes sufficient for attorney who arrived in court late, although it would have been inadequate for juror or witness), *cert. denied*, 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976); *Kandel v. State*, 252 Md. 668, 672, 250 A.2d 853, 855 (1969) ("[s]ince lateness of an attorney is *misbehavior of an officer of the court*, the guilty one may be punished summarily under [Maryland statute so providing]" (emphasis added)).

Circuit stressed that the trial judge had proceeded by order to show cause and hearing, and held that such a procedure (which is surely distinguishable from one which contemplates no hearing at all, as in the courtroom disruption cases) provides adequate protection of the attorney's rights. *Sykes v. United States*, 144 U.S.App.D.C. 53, 54–55, 444 F.2d 928, 930–31 (1971) (*per curiam*). "One who is tardy or does not appear is not *necessarily* to be dealt with in summary fashion." *In re Brown*, 320 A.2d 92, 94 (D.C.1974) (emphasis added). In *In re Nesbitt*, 313 A.2d 576, 578 (D.C. 1973), this court questioned the appropriateness of proceeding by summary contempt pursuant to Rule 42(a) where "the issue of contempt for tardiness involves, by way of excuse, matters outside the presence of the court." (Citations and internal quotation marks omitted.)

In *In re Hunt*, 402 A.2d 834 (D.C.1979) (*Hunt II*), this court, having previously affirmed a summary criminal contempt adjudication of an attorney who had been fined $10.00 for appearing late for trial,[16] held that the trial judge committed reversible error by denying the attorney's subsequent motion to vacate judgment and refusing to consider as "newly discovered evidence" defense material presented in support of that motion which the attorney was unable to submit at the time of his original adjudication because of the summary character of the initial proceedings. The practical effect of *Hunt II* was to alleviate substantially the severity and rigor of the summary process in the "late attorney" context, for the trial judge was ultimately required to consider evidence

not immediately available to the contemnor. Moreover, other courts which subscribe to the minority rule have also recognized that even in summary contempt proceedings, the accused attorney should ordinarily be informed of the charge and given an opportunity to speak to it before guilt is adjudged. *See, e.g., In re Logan*, 52 N.J. 475, 477, 246 A.2d 441, 442 (1968) (*per curiam*).[17]

■ Although none of these cases is precisely on all fours with this one, we think a fair reading of them suggests that, in general, they stand for the proposition that resort to the summary contempt remedy in absent contemnor situations should not be automatic. When there are facts which bear on guilt or innocence, or on the degree of culpability, which the judge cannot ascertain through his or her own senses, the contemnor must be afforded a reasonable opportunity to explain his absence and, if found guilty, to present facts in mitigation. To this end, certain basic rights must be respected unless there is an emergency so extreme as to render this impracticable. We hold that in summary proceedings based on failure to appear in court, the accused is entitled, at least, to notice that he is being charged with criminal contempt, to the meaningful assistance of counsel (which includes a chance to tell the attorney the facts and to secure his or her advice),[18] and to a reasonable opportunity to present a defense.

■ Swisher was denied these rights. What began as a routine proceeding to resolve a bench warrant was not identified

---

16. *In re Hunt*, 367 A.2d 155 (D.C.1976) (*per curiam*) (*Hunt I*), cert. denied, 434 U.S. 817, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977). *See also In re Hunt*, 434 A.2d 440 (D.C.1981) (*Hunt III*), in which, following the remand in *Hunt II*, the trial judge's refusal to vacate the adjudication was affirmed with one judge dissenting.

17. Later, in *In re Yengo*, 84 N.J. 111, 417 A.2d 533 (1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981), the Supreme Court of New Jersey held that the mere unexplained absence of an attorney is a "hybrid" between "direct" and "indirect" contempt and that "the better practice is to proceed on order to show cause even where the contempt is in the face of

the court.... That procedure comports more closely with concepts of procedural due process and eliminates unseemly confrontations between the court and the contemnor." *Id.* at 121, 417 A.2d at 540–41 (citation omitted).

18. The right to consult with counsel is obviously more crucial in this case than it is where the contemnor is an attorney. *See In re Allis, supra*, 531 F.2d at 1393 (ten minutes notice of charges to attorney, so that he may consult with counsel and prepare a defense, held sufficient under the circumstances though obviously inadequate for witness who fails to respond to a subpoena or juror who fails to respond to a summons).

to the participants as a contempt proceeding until adjudication. Although the judge had been advised that Swisher had not had the opportunity to consult with counsel, the case proceeded not only to the determination of guilt but also to sentencing. As soon as he realized that a criminal contempt proceeding was in process, Swisher's attorney made it plain that he was in no position to proceed.[19] Swisher was thus found guilty and sentenced before his counsel had talked to him about the case.

■ Lack of notice and of an opportunity to consult with counsel is intrinsically prejudicial,[20] and we think that Swisher was substantially prejudiced here. If the judge's intention to proceed by contempt had been disclosed, and if counsel had been given even a relatively brief opportunity to talk with his client, he could have determined whether there was any potential defense to the charge.[21] Armed with that knowledge, he could have advised his client on the most fundamental decision which must be made in any criminal case, namely, whether to contest the charge or to concede a violation but request leniency and bring to the court's attention any extenuating circumstances. If Swisher decided to deny his guilt, counsel would have been in a position to advise his client as to whether

he should testify (or otherwise address the court) or remain silent. If the client elected to testify, his attorney could have elicited any information favorable to his cause, and would no doubt have counseled tact rather than confrontation.[22]

An opportunity to consult with his counsel would also have stood Swisher in good stead in relation to the sentencing phase of this very brief proceeding. Reluctant to speak at all on Swisher's behalf without heaving been able to prepare in advance, Mr. Camenisch did state that he "believed" that Swisher had no prior criminal record. Not having interviewed Swisher, however, counsel was precluded from marshalling relevant facts about his client's background, family, education, employment record, good character, good deeds, or potential for rehabilitation. For his own part, Swisher, having received no advice from his attorney as to what he might say on his own behalf in regard to punishment, said very little. Although Swisher was only nineteen years old at the time, had no prior criminal record, and was gainfully employed, the judge gave no apparent consideration to ordering work release or a "weekend" type of sentence which might protect Swisher's job.[23]

**19.** If the judge had announced when the case was called that he was addressing the issue of criminal contempt, rather than the resolution of a bench warrant, counsel would surely have requested at least a few minutes to consult with his client. Although counsel did not use the word "continuance" or "recess," he in effect requested relief of that sort, and the judge in effect denied it.

**20.** Here, as in *Powell v. Alabama,* 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932), "[n]o attempt was made to investigate. No opportunity to do so was given.... Under the circumstances disclosed, we hold that [Swisher] was not accorded the right of counsel in any substantial sense. To decide otherwise would simply be to ignore actualities."

**21.** Swisher told the judge that "my family was just falling apart." Further inquiry was surely called for to determine whether, for example, this "falling apart" involved a serious illness, and what if any service Swisher could or did perform for any ill member of his family.

**22.** In his written order, the judge discerned a "cavalier" attitude on Swisher's part, perhaps

because of the latter's remark that "if it's an expense to you it was a great expense to me in losing my grandfather." Given a minimal opportunity to prepare his client, counsel could surely have advised a more diplomatic approach.

**23.** The judge sentenced Swisher without a presentence investigation, although the provisions of Super.Ct.Crim.R. 32(b)(1), which details the circumstances under which the judge may dispense with such an investigation, had not been satisfied. Swisher has not raised the lack of a presentence investigation in the trial court or on appeal, and we need not and do not decide whether Rule 32(a) applies in summary contempt cases. We allude to the lack of a presentence investigation only to illustrate how matters which would ordinarily be addressed in depth at the time of sentencing can slip through the cracks when the court acts in summary fashion, to the detriment of a measured and thoughtful discussion of the various sentencing alternatives.

There were no pressing circumstances that appeared to compel immediate disposition of the contempt case. Even if Swisher's absence from court on the trial date had created an emergency warranting an immediate remedy, then that emergency would have passed by the time that the proceeding which proved to be a contempt hearing began a day and a half later. *See, e.g., United States v. Meyer*, 149 U.S.App. D.C. 212, 222–23, 462 F.2d 827, 837–38 (1972), discussing restrictions on judge's right to proceed summarily after the emergency has passed. There were several alternatives available to the judge short of summary adjudication of contempt. If Swisher was thought to present a risk of flight in spite of his attempts to contact the court and his surrender to the Pretrial Services Agency, his conditions of release could have been modified accordingly. D.C.Code § 23–1329(a) (1989). The government could have charged him with willful failure to appear, in violation of § 23–1327(a); indeed, that is a common sanction where criminal defendants fail to come to court as required. If a conventional prosecution initiated by the government was thought to be an insufficiently swift means to bring Swisher to justice, the judge could have issued an order requiring him to show cause why he should not be held in criminal contempt, and set the hearing for a few days later. If the court were of the opinion that these alternatives or a combination of them were unnecessarily time-consuming, notification to the parties that criminal contempt proceedings on a charge of willful disobedience of a court order were about to commence, followed by

a continuance even for half an hour to enable Swisher to talk to his lawyer, would have provided the rudiments of a fair hearing.[24]

Under any of these courses of action, Swisher's due process rights would have received more attention. Consequently, proceeding on the spot, without providing Swisher with notice of the charges or with an opportunity to consult counsel, was not "necessary to maintain an orderly system of justice." *In re Gorfkle, supra*, 444 A.2d at 939 (quoting *Hunt I, supra*, 367 A.2d at 158); *see also Jones v. United States*, 560 A.2d 513, 516–17 (D.C.1989); *cf. Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11 (1954).

To compel a defendant to proceed when his attorney has not had the opportunity to prepare a defense has been held to be reversible error. *Brown v. District of Columbia*, 252 A.2d 513, 516 (D.C.1969); *see also Thompson v. Thompson*, 559 A.2d 311, 315 (D.C.1989). In principle, this case is quite similar to *Brown*. Accordingly, the judgment appealed from is reversed and the case is remanded to the trial court for any further proceedings which may be deemed appropriate.[25]

*So ordered.*

SCHWELB, Associate Judge, concurring:

I agree that even under the astonishing minority rule, which postulates that the contemnor's absence occurs in the presence of the court, the judgment in this case must be reversed. The proceedings lacked basic fairness, and there was no emergency

---

**24.** If the judge had proceeded in this manner, and if counsel had ascertained upon consultation with his client that essential witnesses or other evidence could not be produced on the spot, he could have brought these facts to the court's attention and applied for a continuance. In the present case, not having had the opportunity to talk to Swisher, counsel was in no position to advise the judge of any such circumstances.

**25.** Swisher was sentenced to imprisonment for five days. Both the trial court and this court denied his motions for a stay pending appeal, and Swisher served his sentence almost two years ago. Only the collateral consequences of

his conviction remain at issue. *See Fitzgerald v. United States*, 472 A.2d 52, 53–54 (D.C.1984). Under the circumstances, we invite the trial court's attention to the disposition in *Thompson, supra*, 559 A.2d at 315 n. 8, in which this court held it to be "just in the circumstances" to prohibit reprosecution where the defendant had completed serving a fifteen-day contempt sentence which had been imposed almost five years earlier. We do not, however, absolutely proscribe reinstitution of contempt proceedings, and think it appropriate to leave the decision whether further action against Swisher is warranted to the discretion of the trial court.

which warranted the denial of such fundamental protections as prior notice of the nature of the proceedings and a reasonable opportunity to consult with counsel. I would go further, however, and take the next *en banc* opportunity to bury once and for all the misbegotten and unjust minority doctrine that a person's absence occurs in the presence of the court, and therefore justifies summary proceedings at which the contemnor is denied the basic protections conventionally accorded to any person charged with a crime. At the very least, I would explicitly decline to extend this shibboleth beyond the context in which it has heretofore been applied—namely, the case of the trial lawyer who did not appear on time.

### I

The power of courts to impose summary punishment without trial is a most unusual one. *In re Oliver*, 333 U.S. 257, 274–75, 68 S.Ct. 499, 508–09, 92 L.Ed. 682 (1948). It has its origin in the divine right of kings, and its existence "is understandable [only] when seen through the perspective of its age of inception, an age of allegedly divinely ordained monarchies, ruled by a king totally invested with all sovereign legal powers and accountable only to God." R. GOLDFARB, THE CONTEMPT POWER 11–12 (1963). Consistently with the creed which gave it birth, the summary contempt authority has been characterized as "perhaps, nearest akin to despotic power of any power existing under our form of government." *State ex rel. Ashbaugh v. Circuit Court*, 97 Wis. 1, 8, 72 N.W. 193, 194–95 (1897) (quoted in *Green v. United States*, 356 U.S. 165, 194, 78 S.Ct. 632, 649, 2 L.Ed.2d 672 (1958) (Black, J., dissenting)). The Supreme Court has described it as the "rather extraordinary power to punish without the formalities required by the Bill of Rights for the prosecution of federal crimes generally." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

Because summary contempt proceedings represent a departure from accepted standards of due process, and because they are subject to grave abuse, the authority of courts to invoke them has been restricted to " 'the least possible power adequate to the end proposed.' " *Oliver, supra,* 333 U.S. at 274, 68 S.Ct. at 508 (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 230–31, 5 L.Ed. 242 (1821)); *see also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801, 107 S.Ct. 2124, 2129, 95 L.Ed.2d 740 (1987). The power to punish summarily for contempt, and thus to dispense with fundamental constitutional protections, may be invoked " 'only where necessary to maintain an orderly system of justice.' " *In re Gorfkle*, 444 A.2d 934, 939 (D.C.1982) (quoting *In re Hunt*, 367 A.2d 155, 158 (D.C.1976) (*per curiam* ) (*Hunt I*), cert. denied, 434 U.S. 817, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977)); *see also In re Thompson*, 454 A.2d 1324, 1327 (D.C.1982) (*per curiam* ). The "necessities" of the administration of justice must "require" summary disposition before a court may resort to it. *Offutt, supra,* 348 U.S. at 14, 75 S.Ct. at 13.

Necessity connotes an irresistible demand. *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 662 (2d Cir.1971). To say, as we most recently did in *Warrick v. United States*, 528 A.2d 438, 443 (D.C. 1987), that the power to punish summarily should be exercised sparingly, tends, if anything, to understate the constitutional imperative. Fundamental protections such as notice of the charges and the opportunity to consult counsel are not to be overridden in the absence of extraordinary circumstances which leave the trial judge with no reasonable alternative.

For contempt aficionados, the prototypical case in which summary proceedings are deemed appropriate occurred in Stuart England more than three and one half centuries ago. In 1631, a man who had been convicted of a felony expressed his displeasure with that denouement by throwing a brickbat [1] at the Chief Justice. Judi-

---

**1.** Presumably, a fragment of brick which was utilized as a missile. *See* WEBSTER'S THIRD NEW

INTERNATIONAL DICTIONARY 275 (1971). Persons who have hurled verbal brickbats at judges have

cial proceedings were not then, nor are they now, readily manageable when hard objects (or hard insults) are flying around the heads of august jurists. The unfortunate defendant missed the target of his ill-advised wrath, but his imperfect aim did not inure substantially to his benefit. Apparently pursuant to the order of the Lord Chief Justice, the defendant's right hand was cut off and fixed to the gibbet, and he was immediately hanged in the presence of the court. THE CONTEMPT POWER, *supra,* at 15.

Although one might question today whether the Lord Chief Justice sufficiently made it his "object all sublime ... to let the punishment fit the crime," [2] I think most reasonable persons would agree that a judge must have the authority to deal promptly, firmly and effectively with those who physically disrupt judicial proceedings. Such power is required in order to preserve the integrity and dignity of the judicial process. "It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage." *Offutt, supra,* 348 U.S. at 14, 75 S.Ct. at 13. If the case of the flying brickbat were being decided today, summary disposition, albeit with a less drastic remedy, would be found to be justified because two indispensable elements were both present. First, the conduct was so outrageous and disruptive that the "necessities of the administration of justice" required immediate action. *See Offutt, supra,* 348 U.S. at 14, 75 S.Ct. at 13. Second, the misbehavior occurred in its entirety in the Chief Justice's presence, and he presumably acquired personal knowledge of it by his own observation, so that there was no need for the conventional fact-finding which is required when witnesses and lawyers must try to reconstruct in the courtroom, after the fact, events which occurred at a different time and place. *See Cooke v. United States,* 267 U.S. 517, 534–35, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925). Controlling decisions of the Supreme Court establish that the summary

contempt power may be utilized only in situations in which both of these conditions exist.

In *Ex parte Terry,* 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888), a man assaulted a marshal in the "personal view" of the judge, interrupting an ongoing trial. The Supreme Court held that the trial judge had the authority to punish the offender at once, without any notice or hearing. The Court stated that the authority to take such action is essential to the existence of every court, because "[b]usiness cannot be conducted unless the court can suppress disturbances, and the only means of doing that is by immediate punishment." *Id.* at 308, 9 S.Ct. at 81. As the Court put it,

[a] breach of the peace *in facie curiae* is a direct disturbance and a palpable contempt of the authority of the court. It is a case that does not admit of delay, and the court would be without dignity that did not punish it promptly and without trial.

*Id.* The Court recognized, however, that the authority to punish summarily might be abused or exercised arbitrarily, *id.* at 309, 9 S.Ct. at 81, and found its invocation to be justifiable only if the court was

satisfied, from what occurred under its own eye and within its hearing, that the ends of justice demanded immediate action, and that no explanation could mitigate [the contemnor's] offence or disprove the fact that he had committed such contempt of its authority and dignity as deserved instant punishment.

*Id.* at 310, 9 S.Ct. at 81.

In *Cooke v. United States, supra,* the Court reiterated the existence of a judge's authority to punish summarily, but held that it was limited to situations where there was

such an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public in the "very hallowed place of justice," as Blackstone has it, [that if it] is not instantly sup-

---

also been summarily punished. *See, e.g., Fisher v. Pace,* 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949).

**2.** W. GILBERT & A. SULLIVAN, THE MIKADO, Act II, lines 337–39.

pressed and punished, demoralization of the court's authority will follow. Punishment without issue or trial was so contrary to the usual and ordinarily indispensable hearing before judgment, constituting due process, that the assumption that the court saw everything that went on in open court was required to justify the exception; but the need for immediate penal vindication of the dignity of the court created it.

267 U.S. at 536, 45 S.Ct. at 394–95.

In *In re Oliver, supra,* the Court reiterated the principles of *Terry* and *Cooke,* and held that except in a narrowly limited category of cases, one charged with contempt must be accorded basic constitutional protections including, among others, the right to notice of the charges against him, the right to counsel, and the right to present a defense. The Court stated that

> [t]he narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent "demoralization of the court's authority" before the public. If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires, according to the *Cooke* case, that the accused be accorded notice and a fair hearing as above set out.

*Oliver, supra,* 333 U.S. at 275–76, 68 S.Ct. at 508–09. *Accord, Harris v. United States,* 382 U.S. 162, 164, 86 S.Ct. 352, 354, 15 L.Ed.2d 240 (1965) (summary contempt appropriate only in "exceptional circum-stances," such as acts threatening the judge, disrupting a hearing, or obstructing court proceedings, and may not be utilized where swiftness is not a prerequisite of justice).[3]

## II

I do not believe that it can be plausibly argued that, in the present case, there existed conditions of the kind which the Supreme Court has deemed indispensable for the exercise of the summary contempt power. As the opinion of the court in the present case points out, it was certainly not *necessary* for the judge to proceed in this fashion. Various alternatives were available to him, all compatible with Swisher's rights. The judge could have modified the conditions of Swisher's release. He could have issued an order to show cause and tried Swisher a few days later, or at least deferred action until Swisher could consult with his counsel. Another possibility would have been to leave it to the government to institute at bail-jumping prosecution.[4] There was no courtroom disturbance or emergency which required immediate action; indeed, the summary contempt proceeding occurred a day and a half after Swisher had failed to appear. The judge could determine with his own senses that Swisher was not present, but there was no way of assessing, without additional information from Swisher or others, *why* Swisher had been absent and whether his conduct was willful, so that "not all of the essential elements of the offense [were] under the eye of the court." *Harris, supra,* 382 U.S. at 164, 86 S.Ct. at 354. The only conceivable basis for sustaining a proceeding as summary as the one which the judge conducted here is by analogy to the "absent trial lawyer" cases. I think that we should, in the words of Mark Anthony, come to bury that line of authority, and not

---

**3.** Even where a defendant is disorderly in the courtroom and prompt action would otherwise be called for, summary contempt proceedings may be inappropriate if there is reason to entertain doubts as to his sanity. *See, e.g., Rollerson v. United States,* 119 U.S.App.D.C. 400, 407–08, 343 F.2d 269, 276–77 (1964) (eschewing brickbats and avoiding direct conflict with the judge, the defendant threw a pitcher of water at the prosecutor).

**4.** Judge Beaudin has held that a criminal contempt adjudication of a defendant who failed to appear bars a subsequent criminal prosecution for bail jumping. *United States v. Jackson,* 113 Daily Wash.L.Rptr. 2437, 2442–44 (Super.Ct.D.C. 1985).

to praise it, extend it, or even allow it to survive.

## III

As the *per curiam* opinion recognizes, *see* pp. 90–91, *supra,* a substantial majority of courts have concluded that an attorney's failure to appear in court on time may not be punished as summary contempt. *See Annot.,* 13 A.L.R.4th 123, 159–75 (1982 & Supp.1989). They have done so because a contrary rule is illogical, unfair, and irreconcilable with Supreme Court precedent regarding the limits of the summary contempt power.

Logic is surely strained by the notion that absence amounts to presence. *State v. Ryan,* 59 Hawaii 425, 429, 583 P.2d 329, 332 (1978) *(per curiam).* As the court pointedly observed in *Klein v. United States,* 80 U.S.App.D.C. 106, 108, 151 F.2d 286, 288 (1945) *(per curiam)* (quoting *Ex parte Clark,* 208 Mo. 121, 130, 106 S.W. 990, 997 (1907)):

> The petitioner [contemnor] himself was absent. His acts ad interim were likewise absent. His doings went with him. It would seem like an exquisite and palpable contradiction of terms to complain in one breath that the petitioner [contemnor] and his acts were absent, and in the next breath to say that such absence constituted a presence; that is, a contempt committed in the presence of the court.

An attorney's failure to appear can thus be characterized as having occurred in the presence of the court only in a semantic sense. *In re Lamson,* 468 F.2d 551, 552 (1st Cir.1972) *(per curiam).*

Willfulness is an element of criminal contempt, and "[w]hether such willfulness exists is not something that the court can be aware of from its own observations in the courtroom and without inquiry from other sources." *Taylor v. District Court,* 434 P.2d 679, 681 (Alaska 1967). As the court put it in *United States v. Marshall,* 451 F.2d 372, 374 (9th Cir.1971):

> In Rule 42(a) cases, the judge is his own best witness of what occurred. If he must depend upon the testimony of other witnesses or the confession of the contemnor for his knowledge of the offense, Rule 42(a) does not apply.

In the present case, the judge based his ruling essentially on the "confession" of the contemnor, made in open court without a prior opportunity to consult with counsel.

Several federal appellate courts have also reasoned that summary contempt proceedings are inappropriate where attorneys have failed to appear, because there is no "need for immediate penal vindication of the dignity of the court." *See, e.g., Jessup v. Clark,* 490 F.2d 1068, 1071 (3d Cir.1973); *United States v. Willett,* 432 F.2d 202, 205 (4th Cir.1970) *(per curiam)* (both quoting *Cooke, supra,* 267 U.S. at 536, 45 S.Ct. at 395). In *United States v. Delahanty,* 488 F.2d 396, 398 (6th Cir.1973), the court concluded that an attorney's late appearance did not present "exceptional circumstances ... such as acts threatening the judge or disrupting a hearing or obstructing court proceedings" (quoting *Harris, supra,* 382 U.S. at 164, 86 S.Ct. at 354), and thus did not justify summary punishment. As the court put it in *Willett, supra,* 432 F.2d at 205, any affront to the dignity of the court resulting from the attorney's belated arrival did not constitute "such an unusual situation that summary action was required to protect the judicial institution itself."

In disapproving the use of summary proceedings in absent lawyer cases, several courts have urged that judges be vigilant lest "the drastic power authorized escape the permissible limits of reason and fairness." *Pietsch v. President of the United States,* 434 F.2d 861, 864 (2d Cir.1970) (per Justice Clark), *cert. denied,* 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971); *see also Marshall, supra,* 451 F.2d at 374. These warnings should be heeded.

## IV

Given the force of the foregoing authorities, one might well wonder why the District of Columbia subscribes to the minority "counsel's absence occurs in the judge's presence" rule. Therein hangs a tale.

Forty-five years ago, the Court of Appeals for this Circuit held in *Klein v. United States, supra,* that an attorney's unexcused failure to appear in court following a five-day recess was not misconduct in "the presence of the court" as that term was used in section 268 of the federal Judicial Code, 28 U.S.C. § 385, and could not be punished summarily. Twenty-five years after *Klein,* however, in *Sykes v. United States,* 264 A.2d 894, 895–96 (D.C.1970) (*Sykes I*), this court affirmed an attorney's criminal contempt conviction for failure to appear for a hearing. Although the trial judge had issued an order to show cause, and Sykes had been found guilty following a hearing, Sykes contended on appeal that his contempt had not been committed in the presence of the court and that the proceedings utilized by the judge were insufficient. This court held, however, that the District of Columbia follows what it acknowledged to be the minority rule that

> the offensive conduct, to wit, the absence, occurs in the presence of the court, and the unexcused absence may be held to be contempt of court, provided notice and an opportunity to be heard are given.

*Id.* at 895 (internal quotation marks and footnote omitted). Quoting from *Arthur v. Superior Court of Los Angeles County,* 62 Cal.2d 404, 409, 398 P.2d 777, 780–81, 42 Cal.Rptr. 441, 444–45 (1965), the court provided the following justification for its holding:

> Elusive attorneys are a recurring problem in trial courts, particularly in calendar departments, a fact of which this court may take judicial notice. [Several] cases of this nature have reached this court in the past decade, and in [some] of those cases there was evidence of repeated offenses by the attorneys held in contempt. To hold that Attorney Sykes' failure to appear at the appointed hour was not contempt committed in the presence of the court within the meaning of [our statute] would provide insulation to attorneys who now overextend themselves, and encourage them to go further

in trying the patience of trial judges through absences which obstruct normal courtroom procedure but border upon being excusable.

*Sykes I, supra,* 264 A.2d at 895–96.

Sykes next appealed to the United States Court of Appeals, which reversed his conviction for insufficient evidence of willfulness. *Sykes v. United States,* 144 U.S. App.D.C. 53, 444 F.2d 928 (1971) (*per curiam*) (*Sykes II*). The federal appellate court did not agree, however, with Sykes' procedural contentions. After alluding to its holding in *Klein* that an attorney's failure to appear did not occur in the presence of the court within the meaning of the federal statute, the court continued:

> In the appellant's case, however, and in previous decisions applying the District of Columbia statute, the District of Columbia Court of Appeals has adopted the contrary view. *See In re Shorter,* 236 A.2d 318 (D.C.1967); *In re Saul,* D.C. Mun.App., 171 A.2d 751 (D.C.1961).[5]

> We see no reason for us to interfere with the local court's permissible interpretation of its own statutory contempt authority. We think it pertinent to note also that the District of Columbia trial courts have, at least in the reported cases, conducted a show cause hearing before finding an attorney in contempt. In the light of this practice we cannot say that the local court's interpretation of the District of Columbia statute is unreasonable or that the procedure adopted affords inadequate protection to attorneys cited for contempt.

*Id.* at 55, 444 F.2d at 930. In other words, the federal appellate court approved a procedure under which the judge issued an order to show cause to the offending attorney and subsequently held a hearing—a far cry indeed from what took place in the present case.

Acceptance in this jurisdiction of the doctrine that an attorney's absence occurs in the presence of the court has subsequently

---

5. In *Sykes I,* this court also alluded to *Shorter* and *Saul* as "implicitly" adopting the "minority

position." In fact, neither of these decisions addressed the issue at all. *See* p. 100, *infra.*

led, perhaps inexorably, to holdings that have affirmed criminal contempt convictions in cases in which, unlike *Sykes, Saul* and *Shorter,* no order to show cause was issued, and in which the contemnors were adjudicated in criminal contempt immediately after their belated arrival in court. *See, e.g., In re Gregory,* 387 A.2d 720 (D.C. 1978); *In re Hunt,* 367 A.2d 155 (D.C.1976) (*per curiam*), *cert. denied,* 434 U.S. 817, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977).[6] That development, in turn, led to the even more abbreviated procedure which was here utilized by the trial judge.

This downhill slide was perhaps predictable once the courts of this jurisdiction acceded to the "minority" rule. Since contempts in the presence of the court *are* summary contempts, *see* Rule 42(a), and since no hearing is required in the kinds of disruptive contempts epitomized by *Ex parte Terry* or the case of the flying brickbat, a pristine but indiscriminate logic might lead to the conclusion that the lawyer (or even the layman) who arrives in court late can be sentenced to imprisonment without being told in advance that he is being charged with criminal contempt, and without having the opportunity to discuss his case with his lawyer.

A reading of *Sykes I* and *Sykes II* dispels any notion that either this court or our federal brethren contemplated a procedure such as that utilized by the trial court in the present case. Nevertheless, I find the minority rule logically unsound and incompatible with Supreme Court precedent. I would abandon it once and for all.

As I have noted, this court first explicitly adopted the "minority" rule in *Sykes I,* indicating in that opinion that it had implicitly done so in *Saul* and *Shorter.* The

question whether the court should follow the minority rule rather than the majority doctrine was not raised in either of these cases, however, nor was it of much consequence, since each trial judge had proceeded by order to show cause followed by a hearing. The most that can be said of *Saul* and *Shorter* is that the question here presented merely "lurk[ed] in the record," *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925). These decisions cannot reasonably be viewed as authoritative precedents on the subject. *Id.*

In *Sykes I,* this court did explicitly adopt the "absence occurs in the court's presence" theory, and in *Sykes II,* the federal appellate court chose to countenance that result. Since *Sykes,* this court has dutifully adhered to these precedents in perhaps a dozen cases. In none of them, however, has the court discussed the limitations of a trial judge's summary contempt authority, as defined by the Supreme Court in cases such as *Cooke, Offutt* and *Oliver,* nor has it attempted to reconcile the result which it has reached with the purposes of the summary contempt doctrine. For aught that appears in our jurisprudence on this subject, no constitutional issue is presented at all.

We should not go into the twenty-first century, or even the last decade of the twentieth, clinging to a rule which has as little basis in reason or fairness as this one.[7] In the words of one of this nation's greatest jurists, "it is revolting to have no better reason for a rule of law then that it was laid down in the time of Henry IV." O.W. HOLMES, THE PATH OF THE LAW 187 (1921). At an appropriate *en banc* sitting of this court, "absence equals presence" should join Bolingbroke[8] in comparative

**6.** For the subsequent history of the *Hunt* case, which itself demonstrates the deficiencies of summary proceedings in cases of this kind, *see* the *per curiam* opinion at pp. 91–92 & note 16.

**7.** In *Sykes I,* as we have noted, this court justified its adoption of the minority rule on the theory that it was required to enable judges to deal with attorneys who took on too many

cases. The court provided no explanation why there was an emergency so great that non-summary proceedings would be inadequate to deal with this situation, nor did it address the question whether the misconduct in its entirety was observable by the court.

**8.** This was Henry IV's name before he seized the throne in questionable fashion from his cousin, Richard II.

historical oblivion.[9]

9. In any event, I would not extend "absence is presence" from the context of the late-arriving lawyer to that of an unschooled layman. Since a lawyer has legal training, the consequences of having to proceed without counsel and without being told of the charge, while unfair enough, are not as devastating as they are to a layman still in his teens such as Swisher. *See In re Allis,* 531 F.2d 1391, 1393 (9th Cir.), *cert. denied,* 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976). Recently, in *Hercules & Co. v. Shama Restau-* *rant Corp.,* 566 A.2d 31 (D.C.1989), we declined to extend another outmoded doctrine, which was inconsistent with Supreme Court precedent in analogous federal cases, but to which this court was committed under *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971), even though it was arguably difficult to articulate a persuasive distinction between the situation to which the doctrine applied and the circumstances to which we were asked to extend it.